FILED

2022 Sep-19 PM 01:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ALABAMA
 2                      SOUTHERN DIVISION

 3

 4    UNITED STATES OF AMERICA,     *
              Plaintiff,        *CASE NUMBERS:
 5                              *2:19-cr-00466-ACA-JHE
      vs.                       *2:20-cr-00151-ACA-JHE
 6                              *2:20-cr-00405-ACA-JHE-1
      ROLANDO ANTUAIN WILLIAMSON, *April 15, 2022
 7    ADRIEN HIRAM TAYLOR,       *Birmingham, Alabama
      HENDARIUS LAMAR ARCHIE,     8:54 a.m.
 8    ISHMYWEL CALID GREGORY,
              Defendants.
 9    ******************************

10

                          VOLUME V
11

12                 TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ANNEMARIE CARNEY AXON
13               UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and
25    Procedures Vol. VI, Chapter III, D.2.  Transcript produced by
                      computerized stenotype.
```

*LAUREN SHIRLEY, RPR, CRR*
Federal Official Court Reporter
1729 5th Ave N
Birmingham, AL 35203
256-390-9655/lauren_shirley@alnd.uscourts.gov

V-878

```
 1                        APPEARANCES

 2
                FOR THE UNITED STATES:
 3              Jonathan S. Cross, Esq.
                Assistant US Attorney
 4              1801 4th Avenue North
                Birmingham, Alabama 35203
 5              205-244-2233

 6              Gregory Dimler, Esq.
                Assistant US Attorney
 7              1801 4th Avenue North
                Birmingham, Alabama 35203
 8              205-244-2223

 9              FOR DEFENDANT WILLIAMSON:
                Paul McLaurin Woodfin , III, Esq.
10              Paul McLaurin Woodfin, III, Attorney at Law
                102 W. Clinton Avenue., Ste. 202
11              Huntsville, Alabama 35801
                256-585-2848
12
                FOR DEFENDANT TAYLOR:
13              Bruce A. Gardner, Esq.
                Bruce A. Gardner, Attorney at Law
14              P.O. Box 18636
                Hunstville, Alabama 35804
15              256-533-5756

16              FOR DEFENDANT ARCHIE:
                Alison Wallace, Esq.
17              Alison Wallace, Attorney at Law
                P.O. Box 36926
18              Hoover, Alabama 35236
                205-500-1667
19
                FOR DEFENDANT GREGORY:
20              Stuart D. Albea, Esq.
                Stuart D. Albea, Attorney at Law
21              P.O. Box 2673
                Tuscaloosa, Alabama 35403
22              205-248-9556

23              ALSO PRESENT:

24              COURTROOM DEPUTY: SARAH CARMICHAEL

25              COURT REPORTER:   LAUREN SHIRLEY, RPR, CRR
```

*LAUREN SHIRLEY, RPR, CRR*
Federal Official Court Reporter
1729 5th Ave N
Birmingham, AL 35203
256-390-9655/lauren_shirley@alnd.uscourts.gov

V-879

1                          I N D E X

2

**ISIAH THOMAS**
3         Direct Examination                              900
          By Ms. Wallace
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*LAUREN SHIRLEY, RPR, CRR*
Federal Official Court Reporter
1729 5th Ave N
Birmingham, AL 35203
256-390-9655/lauren_shirley@alnd.uscourts.gov

<u>**P R O C E E D I N G S**</u>
(In open court at 8:54 a.m. Defendants present.)

THE COURT: All right. A couple of preliminary issues. The instructions that I've provided you this morning are similar but not exactly the same as the instructions that we discussed last night. I have made some revisions to these instructions. They are highlighted for you, but read them carefully because -- I think you've had an opportunity to start reading them at least because this is exactly what you will hear come out of my mouth. And then, have the defense attorneys had the opportunity to review the proposed instruction on distribution of controlled substance?

MR. GARDNER: I have, Your Honor.

THE COURT: I just want to make sure.

MS. WALLACE: I have, Your Honor.

THE COURT: Okay. And have you all had the opportunity to review the changes that I have made to the continuing criminal enterprise?

MR. WOODFIN: Your Honor, I have. And, Your Honor, I do have, I suppose, an objection to the change in count -- well, not count. Sorry, Judge. Element 5 of the instruction. The pattern instruction statute contains the term "principal administrator".

THE COURT: It does. But if you read the pattern instruction in its entirety, it then goes on to say the

1  government must, also, when I'm describing the elements and

2  giving them more information about each element -- it says, The

3  government must also prove that Mr. Williamson was an

4  organizer, supervisor, or manager. So I have used the language

5  that is contained -- I'm presuming that this difference is

6  intentional, which is to say that they're using either word

7  interchangeably. I have not -- and I can go back, and I want to

8  do that, and confirm that I have not seen the principal

9  administrator in the case law.

10       MR. WOODFIN: Well, I think -- and the reason --

11       THE COURT: I would have to check -- let me just -- and

12  I don't mean to cut you off.

13       MR. WOODFIN: Sure.

14       THE COURT: If I put principal administrator there,

15  then I'm going to have to change it in the other place. I mean,

16  otherwise, this is what happens: We'll get a question from the

17  jury, and then, I'll have to say, I can't answer that.

18       MR. WOODFIN: My concern -- Your Honor, I don't

19  disagree with the court's comments and use of these words, that

20  it would be easier for the jurors to digest. What gives the

21  defense pause, Judge, is in the Criminal Enterprise Statute,

22  Subsection A is a section that speaks -- and those terms are

23  defined only in managing, supervising, directing, and the

24  penalty for that is a minimum of 20 to life.

25       But when you go down to Subsection B, new language

1  appears, principal administrator and 300 times the amount of
2  841, and that's when mandatory life comes on the table. So I
3  think the jurors have to have that principal administrator
4  language because of the implications from *Elaine because
5  there's different penalties --
6          THE COURT: Yeah.
7          MR. WOODFIN: If you're just a manager, supervisor
8  among others --
9          THE COURT: You get 20 years.
10         MR. WOODFIN: -- you get 20 to life. But if you're the
11 principal administrator, which he was charged with in the
12 indictment, Subsection B. They allege those two elements, that
13 he was principal administrator and 300 times the amount
14 methamphetamine in 841.
15     So, Judge, I do believe that that specific language has to
16 go to the jury, or it would not be in line with the statute of
17 the case law, Judge.
18         THE COURT: Okay. Can you give me just a second to
19 review it?
20         MR. WOODFIN: Yes, ma'am.
21                     (Brief pause.)
22         THE COURT: Let me hear from the government. I said,
23 Let me hear from the government.
24         MR. DIMLER: Oh, that's you.
25         MR. CROSS: Your Honor, frankly, I think Mr. Woodfin is

1   correct.

2          THE COURT: Okay. Y'all could have jumped in and said

3   he's right.

4          MR. CROSS: I was coming to that conclusion as we were

5   sitting here.

6          THE COURT: Oh, okay. We'll make that change. Are there

7   any other changes? I will sustain your objection to the

8   proposed jury instruction and change it accordingly. Are there

9   any other objections to the instructions?

10         MR. GARDNER: None from Mr. Taylor, Your Honor.

11         MR. ALBEA: None from Mr. Gregory.

12         MS. WALLACE: None from Mr. Archie, Your Honor. But I

13  filed a motion for a jury instruction for buyer-seller

14  relationship. Now, the government is objecting to it. But, Your

15  Honor, I think it's only fair, in light of the fact that, if

16  the jury doesn't believe Ike Thomas, they don't -- they can't

17  really tie Mr. Archie into a conspiracy other than just being a

18  buyer or seller.

19         THE COURT: Okay. I'm pulling up your instruction. When

20  did you file this?

21         MS. WALLACE: This morning.

22         THE COURT: Oh, hold on one second.

23         MS. WALLACE: I'm sorry.

24         THE COURT: No, no. I have not gotten over, and I hope

25  I never get over, someone saying they filed -- that gnawing

1  feeling in your stomach when they say, I filed something.

2                          (Brief pause.)

3          THE COURT: Has the government had the opportunity to

4  review this instruction?

5          MR. DIMLER: We did, Your Honor. We read it this

6  morning, and as Ms. Wallace said, we are opposed to it.

7          THE COURT: Do you want to articulate the grounds for

8  your opposition?

9          MR. DIMLER: Yes, Your Honor. Our position is that the

10 buyer-seller relationship is similar to where the court might

11 get an entrapment defense. The evidence has to support the

12 instruction.

13     So, for example, if the only evidence before the court --

14 before this jury, was that on a sole or limited occasion, there

15 was a sale of drugs from one person to another, then I think

16 Ms. Wallace would have a point.

17     But I think that there's been evidence through Isiah

18 Thomas that there was an ongoing transfer of marijuana from Mr.

19 Williamson and Mr. Archie and through other individuals. So,

20 the evidence doesn't support that determination. The evidence

21 supports that he was involved in a conspiracy. And so, I think,

22 Judge, the only instance where that would be applicable was

23 where, like entrapment, where there was, actually, just, you

24 know, evidence that limits the jury's ability to make that

25 finding. Here, I just don't think it's appropriate, Judge.

```
1              MS. WALLACE: Your Honor, if I might respond to Mr.
2    Dimler?
3              THE COURT: You may.
4              MS. WALLACE: The jury -- the proposed jury charge says
5    nothing about entrapment. And I believe that, if the jury
6    chooses to disbelieve Mr. Thomas, that that charge is totally
7    relevant and appropriate.
8              THE COURT: Well, I think there's a meaningful
9    distinction between the instruction you proposed and an
10   instruction about entrapment, chief among them being that
11   entrapment is an affirmative defense. My -- and the first thing
12   that comes to my mind with respect to, "There's not enough
13   evidence to support that instruction", I mean, if that were the
14   standard, then the defendants would object to all of the
15   instructions that you asked for because they don't think
16   there's been enough evidence of that.
17        So it's a jury determination. With that said, though, I'm
18   not sure -- let me pull up for a second -- I think that the
19   conspiracy instruction -- sorry. I stopped my sentence.
20                        (Brief pause.)
21             THE COURT: I'm reading Brown. In that case, it was --
22   there was no evidence of it. The defendant had testified in
23   that case, but he said there was no other evidence. And we do
24   have the evidence that Mr. Thomas -- of Mr. Thomas's testimony.
25   I'm not sure that the instruction, the conspiracy instruction
```

1   itself, does not capture -- it's certainly not as robust as the

2   one that you've proposed, but it does capture. It says that

3   simply being present at the scene or merely associated with

4   certain people when discussing common goals and interests

5   doesn't establish -- so the fact that he bought from him is not

6   sufficient evidence.

7        MS. WALLACE: And I guess, Your Honor, that's my

8   concern, that the jury understands that, because the

9   sentence -- there's a sentence in that charge that says, A

10  conspiracy is an agreement by two or more persons to commit an

11  unlawful act. Clearly, to possess marijuana is the unlawful

12  act. And I guess, that was my main concern, Your Honor, that

13  the jury would see that as tying Mr. Archie into the

14  conspiracy, whether they believe Mr. Thomas or not.

15                 (Brief pause.)

16       THE COURT: How about this? I'm not comfortable with

17  your proposed instruction. I know that there's -- looking at

18  Brown and going to the next cases there's another one that had

19  an instruction that is actually captured in the conspiracy

20  pattern jury instruction. I see your point. I do try, just so

21  that the jurors don't fall asleep, to use inflection. And it

22  might be that I stop or I cough or something like that. What if

23  I read -- I try to keep my -- the inflection neutral.

24       What if when I was reading beyond the elements, I read it

25  in this way, a person may be a conspirator even without

1  knowledge -- I'm sorry -- even without knowing all of the
2  details of the unlawful plan or the names and identities of all
3  the other alleged conspirators. If a defendant played only a
4  minor part in the plan but had a general understanding of the
5  unlawful purpose of the plan and willfully joined in the plan
6  on at least one occasion, that's sufficient for you to find the
7  defendant guilty. But simply being present at the scene of an
8  event merely associating with certain people and discussing
9  common goals and interests doesn't establish proof of a
10 conspiracy.
11      Also, a person who doesn't know about a conspiracy but
12 happens to act in a way that advances some purpose of one
13 doesn't automatically become a conspirator. And I think that --
14 by reading it that way, I capture their attention. And I
15 emphasize that in a way that addresses your concerns but
16 doesn't require a separate instruction that I think goes beyond
17 what I really need to do here.
18          MS. WALLACE: Thank you, Your Honor.
19          THE COURT: Is that sufficient for y'all?
20          MR. CROSS: No objection, Your Honor.
21          THE COURT: And I will try to keep the face neutral at
22 all times. I'm also willing to accept if the bar wants to
23 donate money for a facelift that changes this permanently. The
24 only requirement is that it also has to include my neck. Okay.
25 Are there any other objections to the instructions?

1          MR. WOODFIN: Your Honor, I don't have any other
2  objections, but I want to make sure that the court was aware I
3  did file the opposed proposed instruction that the court has
4  already denied on the record.
5          THE COURT: And I'm going to deny it. We're going to
6  enter a text order, and we're going to deny it now. Thank you.
7          MR. WOODFIN: Nothing else from Mr. Williamson.
8          THE COURT: Okay. Let's move on to your motions,
9  please.
10         MR. WOODFIN: Your Honor, should --
11         THE COURT: Where ever you're most comfortable.
12         MR. WOODFIN: Your Honor, at this time, on behalf of
13  Mr. Williamson, we move for a judgment of acquittal. Even
14  viewing the evidence in the light most favorable to the
15  government, a reasonable trier of fact could not find guilty
16  beyond a reasonable doubt as to each of the elements Mr.
17  Williamson's charged with. And, Judge, I'll go sequentially for
18  the benefit of the court.
19         First, Judge, Mr. Williamson is charged with continuing
20  criminal enterprise 21 USC 848. There's several elements that
21  the government has to prove, at least to the point where a
22  reasonable trier of fact could conclude that they could find
23  guilt beyond a reasonable doubt. Your Honor, the two
24  elements -- well, they have not met that burden on any of the
25  elements, but specifically, as to the element of a principal

1    administrator, Judge. The evidence has not met that threshold.

2         There was testimony from two experienced law enforcement

3    agents, but in the end, there was no testimony about any of the

4    other co-defendants being directed -- or excuse me -- connected

5    to Mr. Williamson in a way that would show, from the law

6    enforcement agents, that he was a principal administrator of a

7    far-flung drug organization. There was testimony from Mr.

8    Thomas about him possibly selling to a lot of other people and

9    telling those other people to sell. But in the end, Judge, they

10   have not met their burden there or that he managed, directed,

11   or supervised any of these other various names that were

12   mentioned.

13        Judge, as to the second count, the conspiracy, again, Your

14   Honor, there hasn't been evidence that directly links up these

15   gentlemen charged in a way that would show a conspiracy. If

16   anything, Judge, the evidence has shown that they were engaged

17   in separate alleged criminal actions. The testimony was that

18   Mr. Taylor and Mr. Williamson had no dealing together. Even the

19   testimony from some of the cooperating defendants, some of them

20   didn't even know Mr. Gregory.

21        And I believe even during some of Mr. Albea's questioning

22   of law enforcement, during these controlled buys that had

23   happened, there was video evidence of one with Mr. Taylor, and

24   then audio evidence of one with Mr. Gregory. There was no

25   connection between Mr. Williamson to any of those controlled

1 buys or certainly not that he was directing -- and I think
2 there was testimony that he was not directing, or they did not
3 have evidence that he was directing Mr. Gregory and Mr. Taylor
4 to engage in those buys. So they failed to meet the standard on
5 Count 2, Judge.
6      With the 924 counts, Judge, which is Count 7 and
7 superseding indictment in Count 1 in a separate indictment with
8 a 405 case number, the government has also failed to show the
9 reasonable trier of fact can conclude guilt beyond a reasonable
10 doubt.
11      And, Your Honor, as to Count 1 in the 405 indictment,
12 there were two guns. There was a .380 and a Glock. The Glock
13 was in the car. The .380 was alleged to be on Mr. Williamson's
14 person. I know there was follow-up questions on the function of
15 the .380. I recall that. There's been a lot of testimony taken
16 in this case, but my notes indicated that there was not
17 testimony about function testing as to the Glock. And that
18 was -- the follow-up was about the .380, Judge, and the
19 definition of a firearm, it has to be able to readily explode a
20 projectile. I might be muddling the language a bit there,
21 Judge, but that's the thrust. That's what my notes say. That
22 was days ago at this point, but that's what I have in my notes.
23 If the record says different, then I'm wrong on that. But
24 that's what I had, Judge, so I think that would apply to the
25 gun in the car, Judge, and they haven't met the standard there.

1        As to the substantive counts, Your Honor, in particular,

2   with Count 8, there was -- that was evidence from a cooperating

3   witness that did not testify here in court. And as to the other

4   counts, they have not met the standard that a reasonable juror

5   could conclude guilt beyond a reasonable doubt.

6        And lastly, Judge, as to the 843 counts, and I believe

7   there are five of which are still alleged against my client,

8   they have not met the standard there. In particular, Judge,

9   with Count 35, which was an alleged conversation between my

10  client and Leanthony Gillins where no slang terminology was

11  used. Merely the word "it" was used. So that's -- that is not

12  evidence of a felony drug offense being discussed over a

13  communication facility.

14       And, Your Honor, we ask that the court grant this motion.

15  Thank you.

16            THE COURT: What exhibit number was the conversation

17  between Mr. Williamson and Mr. Gillins?

18            MR. WOODFIN: Your Honor, I have that as Exhibit 66, I

19  believe, Judge, if not 67.

20            THE COURT: Madam Court Reporter, do you have a way to

21  search, I believe it was the first day of testimony, on Glock?

22            COURT REPORTER: Yes, ma'am.

23            MR. WOODFIN: Your Honor, it's 66.

24            THE COURT: Yeah. May I hear from the government?

25            MR. CROSS: Yes, Your Honor. I'll take it on the

1  starting off -- and Lauren may still be looking for

2  functionality of the Colt Mustang that was taken out of his

3  pocket. I actually specifically recalled, I think in the

4  initial testimony, Agent Gerhardt did not testify to the

5  functionality, but then we cleaned it up, and he did testify to

6  it later in his testimony.

7      On that issue, Your Honor -- and also, that's a

8  functionality test. I mean, they can still 942(c) that the

9  firearm was involved. That's just whether or not it -- it's not

10  an element of the crime specifically. We just have to prove

11  that it was a firearm, and I think we've done that.

12      Then, on the telephone count, Count 35, concerning the

13  conversation between Williamson and Gillins, Government's

14  Exhibit Number 66, there was extensive testimony of Thomas that

15  Gillins was Williamson's right-hand man, and the house was the

16  hub of the drug trafficking organization. And Gillins was

17  arriving at the house, and they discussed that, and the jury

18  can easily infer from all the testimony that was presented that

19  that was a communication over a facility involving their

20  continuing ongoing conspiracy.

21      Under 924c, I'll just point out, always, they don't have

22  to actually use the gun in conducting drug transactions. The

23  offense is whether or not it has the potential to facilitate.

24  We call that the just-in-case gun. If somebody tries to steal

25  the drugs --

1          THE COURT: If it doesn't operate it, can't be the just

2   in case.

3          MR. CROSS: That's true. Absolutely. But I think we did

4   that.

5          THE COURT: I remember you calling Agent Gerhardt back.

6   My confusion is that I understood Mr. Woodfin to say that that

7   clean up testimony was about the other gun. Is that correct,

8   Mr. Woodfin?

9          MR. WOODFIN: Judge, my memory is that there was the

10  Glock in the car. My argument is that that Glock in the car,

11  there was no testimony about a functionality test as to it, and

12  it's charged in the indictment. My memory is when he got called

13  back, Agent Gerhardt testified about the .380 found in the

14  pocket and testified about a functioning test as to that gun,

15  but there's two guns charged. And I don't believe there was any

16  evidence regarding the functionality test for the Glock in the

17  car.

18         THE COURT: Okay. Mr. Cross, do you have anything else

19  that you wish to say at this time?

20         MR. CROSS: No, Your Honor.

21         THE COURT: Okay. We're going to stop for a minute so

22  that the court reporter can make her search. Or actually, you

23  know what, I'm going to withhold ruling on -- well, no, we're

24  going to let the court reporter do her search.

25                  (Brief pause.)

```
 1           THE COURT: Let's go back on the record. I'm listening.
 2   Let me begin by saying, I don't 942(c) evidence of the question
 3   being posed to Agent Gerhardt. It makes me anxious because,
 4   obviously, we're doing a 942(c) on a transcript -- and it's not
 5   a certified transcript -- but we've looked under "function".
 6   We've looked under "106". We've looked under all the other guns
 7   and cannot 942(c) the functionality test. Mr. Cross, you're
 8   suggesting that it's irrelevant?
 9           MR. CROSS: Yes, Your Honor.
10           THE COURT: May I hear from you on that?
11           MR. CROSS: Yes, Your Honor. To begin with, with the
12   jury instruction and pursuant to the statute, a firearm is
13   readily convertible to expel a projectile by the action of an
14   explosive. Readily convertible, meaning it could be made so
15   that it doesn't have to function at the moment, but it could be
16   made to function. And it goes on to say the term includes a
17   frame or receiver of any such weapon or any firearm, muffler,
18   or silencer.
19           Further in this case, we have admitted the actual gun. And
20   the jury, through their own experience, can look at the gun and
21   make a determination as to whether or not it's capable of
22   expelling a projectile. Two cases I would like to cite for the
23   court is the Williams case, 979 F.2d 186. It's not necessary
24   for the government to introduce the gun in evidence in order to
25   sustain a conviction, and in the William's case, a police
```

1   officer testified that the defendant was in possession of a

2   firearm. Also, in the Hunt case, 187 F.3d, a bank teller's

3   testimony that the defendant had a gun is sufficient to

4   establish that the gun was used.

5         And so, Your Honor, based on all of that, we just don't

6   think it's an element. We think we overreach by even saying

7   that they were functional. We don't think we had to even do

8   that.

9             THE COURT: What's the one that you said, the third

10  cite again?

11            MR. CROSS: I closed my book.

12            MR. CROSS: The Williams cite or the Hunt cite?

13            THE COURT: Hunt, please.

14            MR. CROSS: Hunt is 187 F.3d 1269.

15                  (Brief pause.)

16            THE COURT: Okay. Thank you. I am going to deny Mr.

17  Williamson's motion. May I hear from Mr. Gardner?

18            MR. GARDNER: Good morning, Your Honor.

19            THE COURT: Good morning.

20            MR. GARDNER: Your Honor, for the record, and on behalf

21  of my client, Mr. Taylor, I move for judgment of acquittal on

22  behalf of Mr. Taylor as to Count 2, conspiracy; Counts 11 and

23  12, possession with intent to distribute; Counts 20, 21, 22 --

24  21, 22, and 23, use of a communication facility; and cite as my

25  grounds that the government has failed to prove the defendant's

1  guilt beyond a reasonable doubt.

2      In all candor, and with deference to this court and the

3  government, Your Honor, I am constrained to be any more

4  specific than that.

5      THE COURT: Thank you. Your motion is denied. May I

6  hear from Mr. Albea on behalf of Mr. Gregory?

7      MR. ALBEA: Thank you, Your Honor. On behalf of Mr.

8  Gregory, I would move for a judgment of acquittal relative to

9  Count 2, the conspiracy count, and Count 13, the distribution

10  count. Relative to Count 13, all we have is a phone call that

11  may or may not be Mr. Gregory, and I don't think that that's

12  enough. We don't have that the person who did the buy, to

13  identify Mr. Gregory, and so I don't think that that's enough

14  that a reasonable trier of fact can conclude that Mr. Gregory

15  was the -- was the person who sold the cocaine in that

16  particular instance.

17      And relative to Count 2, there's just been testimony from

18  cooperating individuals saying that Mr. Gregory was a part of

19  some sort of conspiracy, and again, I don't think that that's

20  enough that a reasonable trier of fact could possibly conclude

21  that he was guilty of conspiracy, so we would move for judgment

22  of acquittal relative to Count 2 and Count 3 for Mr. Gregory.

23      THE COURT: Thank you. It is denied. Ms. Taylor?

24      MS. WALLACE: Your Honor, as to Count 2, the conspiracy

25  count -- if you can hear me --

1          THE COURT: Can you hear, Madam Court Reporter?

2          COURT REPORTER: I can hear.

3          MS. WALLACE: With respect to Count 2, the conspiracy

4    count in the 2:19-cr-466, Judge, I would adopt Mr. Woodfin's

5    argument on that, that they have not made a case of a

6    conspiracy. It seems that each defendant has somewhat been on a

7    little island by themselves. So I would just adopt Mr.

8    Woodfin's argument on that.

9          And, Your Honor, in case 2:20-cr-151, in the first in

10   Count 1, it's alleged that there was possession of controlled

11   substance with intent to distribute. Your Honor, I would say

12   that there has been no proof that there were over personal use

13   amounts and that there was any intent to distribute.

14         And as to Count 2, if the finding on Count 1 is not

15   guilty, there is no furtherance of the drug trafficking crime

16   to have the gun in relation to it, Your Honor. So those would

17   be our basis for the motion.

18         THE COURT: Thank you. It is denied. Is there anything

19   else we need to take up before I instruct the jury? Oh, I'm

20   sorry. Before Ms. Taylor presents her evidence?

21         MS. WALLACE: That would be all, Your Honor.

22         THE COURT: Okay. Do the Marshals have Mr. Thomas on

23   this floor?

24         MARSHAL: Fourth. We have him downstairs. We have him

25   here.

1          THE COURT: Okay. Why don't you all go grab him, and

2    we'll knock on the door when we want you to bring him in.

3               (Recess at 10:09 a.m. to 10:20 a.m.)

4          THE COURT: Before we bring the jury in, can we go on

5    the record so I can talk to Mr. Archie about his rights to

6    present evidence and testimony. Is everyone ready?

7          MR. GARDNER: Yes, Your Honor.

8          THE COURT: All right. Y'all ready?

9          MR. CROSS: Yes.

10         MS. WALLACE: Yes, Your Honor.

11         THE COURT: Just a second, Sarah. Wait. I have to talk

12    to Mr. Archie. Ms. Wallace, I understand that Mr. Archie is

13    going to be presenting evidence in his defense; is that

14    accurate?

15         MS. WALLACE: That is correct, Your Honor.

16         THE COURT: Will he be testifying?

17         MS. WALLACE: No, Your Honor.

18         THE COURT: Mr. Archie, do you understand that you are

19    not required to present evidence in this case? You have to

20    answer for the record, please.

21         THE DEFENDANT: Yes, ma'am.

22         THE COURT: And do you understand that you are not

23    required to testify?

24         THE DEFENDANT: Yes, ma'am.

25         THE COURT: But you could testify if you wanted to.

 1          THE DEFENDANT: Yes, ma'am.

 2          THE COURT: And these decisions are your decision

 3  alone. It is not a decision for Ms. Wallace to make. She can

 4  certainly advise you, and I'm sure that she has, but it's a

 5  decision that's solely yours. Do you understand that?

 6          THE DEFENDANT: Yes, ma'am, I understand that.

 7          THE COURT: And have you made a decision on your own?

 8          THE DEFENDANT: Yes, ma'am.

 9          THE COURT: And what is that decision?

10          THE DEFENDANT: Not to testify.

11          THE COURT: Okay. But you do wish to present evidence?

12          THE DEFENDANT: Yes, ma'am.

13          THE COURT: Okay. And you have made this decision free

14  of any promises, coercions, or threats?

15          THE DEFENDANT: Yes, ma'am.

16          THE COURT: All right. Thank you. We'll begin. I'm

17  going to ask the jury to come in, and then you can call -- then

18  we'll let the other defendants rest, and then you will call

19  your witness.

20          MS. WALLACE: Thank you, Judge.

21          THE COURT: Thank you. Let's bring the jury in.

22                  (Jury in at 10:24 a.m.)

23          THE COURT: Good afternoon, ladies and gentlemen. And I

24  appreciate and thank you for your patience this morning. At

25  this time, as you know, the government has rested, and it's the

 1  defendant's opportunity to present evidence or testimony if

 2  they want to. There is no obligation for them to. Mr. Woodfin,

 3  on behalf of Mr. Williamson.

 4          MR. WOODFIN: Your Honor, Mr. Williamson rests, Judge.

 5          THE COURT: Mr. Gardner.

 6          MR. GARDNER: Your Honor, Mr. Taylor respectfully rests

 7  his case.

 8          THE COURT: Mr. Albea.

 9          MR. ALBEA: Your Honor, Mr. Gregory rests his case.

10          THE COURT: Ms. Wallace?

11          MS. WALLACE: Your Honor, we would recall Isiah Thomas

12  in Mr. Archie's case.

13          THE COURT: Will the Marshals bring Mr. Thomas in? Mr.

14  Thomas, I'll remind you that yesterday you were sworn in to

15  give your testimony, and you're still under that oath. Do you

16  understand that?

17          THE WITNESS: Yes, ma'am.

18          THE COURT: So you understand your obligation to be

19  truthful?

20          THE WITNESS: Yes, ma'am.

21          THE COURT: Thank you.

22          MS. WALLACE: Thank you, Your Honor.

23                          DIRECT EXAMINATION

24  BY MS. WALLACE:

25  Q   Mr. Thomas, do you remember answering questions for me

1  yesterday?

2  A    Yes.

3  Q    Do you remember telling me you weren't here snitching on

4  anybody?

5  A    Yes.

6  Q    What term would you use?

7  A    Tell me what I'm here today for, testify. You asked me

8  yesterday did I ever snitch on somebody before I came here. I

9  told you no.

10 Q    You never told the government before yesterday -- you

11 never gave them any information; is that what you're saying?

12 A    No, I'm not saying that. You asked me have I ever snitched

13 on somebody. You asked me if I snitched on my cousin. I told

14 you no.

15 Q    Okay. Maybe we should use a different term.

16 A    Okay.

17 Q    Because maybe you and I don't define "snitch" the same

18 way. Have you ever cooperated against anybody?

19 A    No.

20 Q    You have never cooperated against the -- with the

21 government against any defendant?

22 A    No.

23 Q    Or any person?

24 A    Not of the defendants that's here. The only ones are

25 incarcerated, the defendants that's all here, that's on this

V-902

1  case.

2  Q    So your answer is you have cooperated against people?

3  A    Yes.

4  Q    And I believe you -- there was some testimony about

5  another case you have in federal court; is that correct?

6  A    Yes.

7  Q    And were you -- did you go to trial on that case?

8  A    Yes.

9  Q    Was one of your co-defendants Walter Rhone?

10  A    Yes.

11  Q    Was that your cousin?

12  A    Yes.

13  Q    Do you ever recall talking to any agent about that when

14  you were arrested?

15  A    Yes.

16  Q    Do you ever recall saying that you would cooperate against

17  everybody in the case?

18  A    No.

19  Q    Do you ever recall saying you would cooperate against your

20  cousin Walter Rhone?

21  A    No.

22  Q    So if an agent wrote that in a report, he was lying?

23  A    Yes. If he said I cooperated against Walter Rhone. Walter

24  Rhone did not get charged. If I would have cooperated, he would

25  have got charged. He never got charged.

*LAUREN SHIRLEY, RPR, CRR*
Federal Official Court Reporter
1729 5th Ave N
Birmingham, AL 35203
256-390-9655/lauren_shirley@alnd.uscourts.gov

1   Q      I believe you're mistaken. Was he not one of your

2   co-defendants?

3   A      Yes.

4   Q      So he was charged, correct?

5   A      He was charged, but he never went to jail for it.

6   Q      Okay. In other words, his case was dismissed?

7   A      Yes. Because I didn't cooperate on him.

8   Q      Do you ever recall putting a call on speakerphone so the

9   agents could hear it?

10  A      Yes. They asked me to answer my phone.

11  Q      And you agreed to cooperate?

12  A      Yes. I answered my phone.

13  Q      And you agreed to cooperate?

14  A      Yes.

15  Q      And you put it on speakerphone?

16  A      Yes.

17  Q      So that's not cooperating against somebody?

18  A      You asked me did I tell on him. I did not tell on him.

19  Q      No, sir, I asked you --

20  A      By answering my phone. If you say that's cooperating, it's

21  cooperating. Yes, I answered my phone.

22  Q      And you put it on speaker, correct?

23  A      Yes.

24  Q      So yesterday when you said, you had never snitched on

25  anybody, that wasn't true, was it?

1   A    Yes. That was true because I didn't snitch on him.

2   Q    Please, use your term for what you did against these

3   defendants and him.

4   A    I agreed to answer my phone. I did not snitch on him.

5   Q    Okay.

6   A    You was his lawyer, so you did --

7   Q    I get to ask the questions, not you.

8   A    Oh.

9   Q    So what term do you use for what you did against these

10   defendants?

11   A    I did not snitch to get them in jail. I cooperated to get

12   a life sentence on my part. I did not put them in jail, no. I

13   have never put anyone in jail.

14   Q    Just answer the question. I asked you what term you would

15   use for what you did.

16   A    Save myself.

17   Q    So you'd have done anything to save yourself, wouldn't

18   you?

19   A    No. I wouldn't have done anything, but I saved myself.

20   Q    You'd have said most anything to save yourself, wouldn't

21   you?

22   A    No. I told the truth. I wouldn't lie to save myself. I'm

23   being honest.

24   Q    But you didn't tell the truth yesterday when I asked

25   you --

1  A     Yes, I did.

2           MS. WALLACE: Okay. I've got nothing further.

3           THE COURT: Anything from the government?

4           MR. CROSS: Yes, Your Honor.

5                  (Discussion off the record.)

6           MR. CROSS: Your Honor, we don't have anymore

7  questions.

8           THE COURT: Thank you. Thank you, Mr. Thomas.

9                  (Witness excused.)

10          THE COURT: Ms. Wallace, do you have any other

11  evidence? Do you want to call any other witnesses? Forgive me,

12  my microphone was not on. Do you have anything else that you'd

13  like --

14          MS. WALLACE: No, Your Honor. At this time, Defendant

15  Archie rests.

16          THE COURT: All right. Thank you. Does the government

17  have any rebuttable witnesses?

18          MR. CROSS: No, Your Honor.

19          THE COURT: Ladies and gentlemen, just give me one

20  minute. I want to make sure that I have everything.

21          MR. ALBEA: Judge, may we approach briefly?

22          THE COURT: You may.

23          (Bench conference on the record, as follows:)

24          MR. ALBEA: Judge, now at the close of all the

25  evidence, the government and the defense has rested. On behalf

1    of Mr. Gregory, I would renew my motion for judgment of

2    acquittal and adopt all the previous arguments made previously.

3          THE COURT: Thank you. Your motion is denied.

4          MR. WOODFIN: Your Honor, on behalf of Mr. Williamson,

5    I renew my motion for judgment of aquittal as to count -- well,

6    counts that I previously covered in our prior motion.

7          THE COURT: Your motion is denied.

8          MR. GARDNER: I'll make the same motion -- I'll make

9    the same motion, Your Honor, to renew my argument I made at the

10   conclusion of the government's case.

11         THE COURT: Your motion is denied.

12         MS. WALLACE: Your Honor, on behalf of Mr. Archie, I'll

13   renew the motion made at the end of the government's case.

14         THE COURT: Your motion is denied. Thank you.

15         MS. WALLACE: Thank you, Judge.

16              (Bench conference concluded.)

17         THE COURT: Members of the jury, it is my duty to

18   instruct you on the rules of law that you must use in deciding

19   this case. After I have completed these instructions, you'll go

20   to the jury room and begin your discussions, what we call

21   deliberations. You must decide whether the government has

22   proved the specific facts necessary to 942(c) each defendant

23   guilty beyond a reasonable doubt.

24         Your decision must be based only on the evidence presented

25   here. You must not be influenced in any way by either sympathy

1  for or prejudice against the defendants or the government. You

2  must follow the law as I explain it, even if you do not agree

3  with the law, and you must follow all of my instructions as a

4  whole. You must not single out or disregard any of the court's

5  instruction on the law.

6       The indictments or formal charge against these defendants

7  isn't evidence of guilt. The law presumes every defendant is

8  innocent. The defendants do not have to prove their innocence

9  or produce any evidence at all, and the government must prove

10 guilt beyond a reasonable doubt. If it fails to do that, you

11 must 942(c) the defendant not guilty.

12      The government's burden is heavy, but it doesn't have to

13 prove a defendant's guilt beyond all possible doubt. The

14 government's proof only has to exclude any reasonable doubt

15 concerning the defendants' guilt. A reasonable doubt is real

16 doubt, based on your reason and common sense, after you've

17 carefully and impartially considered all of the evidence in

18 this case. Proof beyond a reasonable doubt is doubt -- excuse

19 me -- is proof so convincing that you would be willing to rely

20 and act on it without hesitation in the most important of your

21 own affairs.

22      If you are convinced that a defendant has proved -- has

23 been proven guilty beyond a reasonable doubt, say so. If you

24 are not convinced, say so. As I have said before, you must

25 consider only the evidence that I have admitted in the case.

1    Evidence includes the testimony of witnesses and the exhibits

2    admitted. But anything that the lawyers say is not evidence and

3    is not binding on you.

4        You shouldn't assume from anything that I have said that I

5    have any opinion about any factual issue in this case. Except

6    for my instructions to you on the law, you should disregard

7    anything that I may have said during the trial in arriving at

8    your own decisions about the facts. Your own recollection and

9    interpretation of the evidence is what matters.

10       In considering the evidence, you may use reasoning and

11   common sense to make deductions and reach conclusions. You

12   shouldn't be concerned about whether the evidence is direct or

13   circumstantial. Direct evidence is the testimony of a person

14   who asserts that he or she has actual knowledge of a fact, such

15   as an eyewitness. Circumstantial evidence is proof of a chain

16   of facts and circumstances that tend to prove or disprove a

17   fact. There's no legal difference in the weight you may give to

18   either direct or circumstantial evidence.

19       When I say that you must consider all of the evidence, I

20   don't mean that you must accept all of the evidence as true or

21   accurate. You should decide whether you believe what each

22   witness has to say, how important the testimony was, and in

23   making the decision, you may believe or disbelieve any witness

24   in whole or in part. The number of witnesses testifying

25   concerning a particular point doesn't necessarily matter.

1        And to decide whether you believe any witness, I suggest

2   you ask yourself a few questions. Did the witness impress you

3   as someone who is telling the truth? Did the witness have any

4   reason not to tell the truth? Did the witness have a personal

5   interest in the outcome of the case? Did the witness seem to

6   have a good memory? Did the witness have the opportunity and

7   ability to accurately observe the things that he or she

8   testified about? Did the witness appear to understand the

9   questions clearly and answer them directly? Did the witness's

10  testimony differ from other testimony or evidence?

11       You should also ask yourself whether there was evidence

12  that a witness testified falsely about an important fact and

13  whether there was evidence that at some other time a witness

14  said or did something or didn't say or do something that was

15  different from the testimony the witness gave during the trial.

16  To decide whether you believe a witness, you may consider the

17  fact that the witness has been convicted of a felony or a crime

18  involving dishonesty or a false statement. But keep in mind

19  that a simple mistake doesn't mean a witness wasn't telling the

20  truth as he or she remembers it. People naturally tend to

21  forget some things or remember them inaccurately. So if a

22  witness misstated something, you must decide whether it was

23  because of an innocent lapse in memory or an intentional

24  deception.

25       The significance of your decision may depend on whether

1   the misstatement is about an important fact or about an
2   important detail. When scientific, technical, or other
3   specialized knowledge might be helpful, a person who has
4   special training or experience in that field is allowed to
5   state an opinion about the matter. But that doesn't mean that
6   you must accept the witness's opinion. As with any other
7   witness's testimony, you have to decide for yourself whether to
8   rely upon that opinion. Retired FBI Agent M. Wayne Gerhardt
9   testified in this case as both an expert witness and as a fact
10  witness. His expert testimony should not be considered as the
11  testimony of a fact witness, and his fact testimony should not
12  be considered as the testimony of an expert.
13      Where a statute specifies multiple alternative ways in
14  which an offense may be committed, the indictment may allege
15  the multiple ways in the conjunction, that is, by using the
16  word "and". If only one of the alternatives is proved beyond a
17  reasonable doubt, that is sufficient for a conviction so long
18  as you unanimously agree as to that alternative.
19      You'll see that the superseding indictment and the other
20  indictments in this case charge that a crime was committed on
21  or about a certain date. The government doesn't have to prove
22  that the offense occurred on an exact date. They only have to
23  prove beyond a reasonable doubt that the crime was committed on
24  a date reasonably close to the date alleged. And the word
25  "knowingly" means that the act was done voluntarily and

1   intentionally and not because of a mistake or by accident.

2       Each count of the superseding indictment charges a

3   separate crime against one or more of the defendants. You must

4   consider each crime and the evidence relating to it separately,

5   and you must consider the case of each defendant separately and

6   individually. If you 942(c) the defendant guilty of one crime,

7   that must not effect your verdict for any other crime or any

8   other defendant. I caution you that each defendant is on trial

9   only for the specific crimes charged in the indictments and the

10  superseding indictment.

11      You're here to determine from the evidence in this case

12  whether each defendant is guilty or not guilty of those

13  specific crimes. You must never consider punishment in any way

14  to decide whether a defendant is guilty. If you 942(c) the

15  defendant guilty, the punishment is for me alone to decide

16  later. Your verdict, whether guilty or not guilty, must be

17  unanimous. In other words, you all have to agree. Your

18  deliberations are secret, and you'll never have to explain your

19  verdict to anyone.

20      Each of you must decide the case for yourself, but only

21  after fully considering the evidence with all of the jurors. So

22  you must discuss the case with one another and try to reach an

23  agreement. And while you're discussing the case, don't hesitate

24  to reexamine your own opinion and change your mind if you

25  become convinced that you were wrong, but don't give up your

1    honest beliefs just because others think differently or because
2    you simply want to get the case over with. Remember that in a
3    very real way, you're the judge, the judges of the facts, and
4    your only interest is to seek the truth from the evidence in
5    the case.
6        When you go to the jury room, you'll receive a verdict
7    form, and you'll choose one of your members to act as a
8    foreperson. The foreperson will direct your deliberations and
9    will speak for you in court. We have prepared a verdict form
10   for your convenience. You'll take the forms with you into the
11   jury room, and when you have all agreed on the verdict, your
12   foreperson must fill in the form, sign it, date it, and carry
13   it. Then, you'll return to the courtroom.
14       If you wish to communicate with me at any time, please,
15   write down your message or question and give it to the Marshal.
16   The Marshal will bring it to me, and I'll respond as promptly
17   as possible, either in writing or by talking to you in the
18   courtroom. But I caution you not to tell me how many jurors
19   have voted one way or the other at that time. I'll also mention
20   that some questions I cannot answer.
21       You must consider some witness' testimony with more
22   caution than others. In this case, the government has made a
23   plea agreement with a co-defendant in exchange for his
24   testimony. Such plea bargaining, as it is called, provides for
25   the possibility of a lesser sentence than the co-defendant

1   would normally face. Plea bargaining is lawful and proper and
2   the rules of the court expressly provide for it, but a witness
3   who hopes to gain more favorable treatment may have a reason to
4   make a false statement in order to strike a good bargain with
5   the government. So while a witness of that kind may be entirely
6   truthful when testifying, you should consider that testimony
7   with more caution than the testimony of other witnesses. And
8   the fact that a witness has pleaded guilty to an offense isn't
9   evidence of the guilt of any other person.
10          The government must prove beyond a reasonable doubt that
11   the defendants were the persons who committed the crime. If a
12   witness identified a defendant as the person who committed the
13   crime, you must decide whether the witness is telling the
14   truth. But even if you believe the witness is telling the
15   truth, you must still decide how accurate the identification
16   is. I would suggest you ask some of the following questions:
17   Did the witness have the adequate opportunity to observe the
18   person at the time that the crime was committed; how much time
19   did the witness have to observe the person; how close was the
20   witness; did anything effect the witness's ability to see; did
21   the witness know or see the person at an earlier time? You must
22   also consider -- or you may also consider the circumstances of
23   the identification of the defendant, such as the way the
24   defendant was presented to the witness for identification and
25   the length of time between the crime and the identification of

1  the defendant.

2      After examining all of the evidence, if you have

3  reasonable doubt that the defendant was the person who

4  committed the crime, you must 942(c) the defendant not guilty.

5  You've been permitted to take notes during the trial. Most of

6  you, perhaps all of you, have taken advantage of that

7  opportunity. You must use your notes only as a memory aid

8  during deliberations. You must not give your notes priority

9  over your own independent recollection of the evidence, and you

10  must not allow yourself to be unduly influenced by the notes of

11  other jurors. I emphasize that the notes are not entitled to

12  any greater weight than your memories or your impressions of

13  the testimony.

14      The law recognizes several kinds of possession. A person

15  may have actual possession, constructive possession, sole

16  possession, or joint possession. Actual possession of a thing

17  occurs if the person knowingly has direct physical control over

18  it. Constructive possession of a thing occurs if the person

19  doesn't have actual possession of it but has the power and

20  intention to take control of it later. Sole possession of a

21  thing occurs if the person is the only one to possess it. Joint

22  possession of a thing occurs if two or more people share

23  possession of it. And the term "possession" includes actual,

24  constructive, sole, and joint possession.

25      It is possible to prove a defendant guilty of a crime even

V-915

1  without evidence that the defendant personally performed every
2  act charged. Ordinarily, any act a person can do may be done by
3  directing another person or an agent or it may be done by
4  acting with or under the direction of others. A defendant aids
5  and abets a person if the defendant intentionally joins with
6  the person to commit a crime. A defendant is criminally
7  responsible for the acts of another person if the defendant
8  aids and abets the other person. A defendant is also
9  responsible if the defendant willfully directs or authorized
10 the acts of an agent, employee, or other associate.

11      But finding that a defendant is criminally responsible for
12 the acts of another requires proof that the defendant
13 intentionally associated with or participated in the crime, not
14 just proof that the defendant was simply present at the scene
15 of a crime or knew about it. In other words, you must 942(c)
16 beyond a reasonable doubt that the defendant was a willful
17 participant and not a knowing spectator.

18      Certain exhibits in this case have been identified as
19 typewritten transcripts of oral conversations heard on tape
20 recordings received in evidence. The transcripts also purport
21 to identify speakers engaged in the conversations. I've
22 admitted the transcripts for the limited and secondary purpose
23 of helping you follow the content of the conversation as you
24 listen to the tape recordings and also to help you identify the
25 speakers. But you are specifically instructed that whether the

1   transcript correctly reflects the content of the conversation

2   or the identity of the speakers is entirely for you to decide

3   based on your own evaluation of the testimony you've heard

4   about the preparation of the transcript and from your own

5   examination of the transcript in relation to hearing the tape

6   recording itself as the primary evidence of its own contents.

7        If you determine that the transcript is, in any respect,

8   incorrect or unreliable, you should disregard it to that

9   extent. In Count 2 of the superseding indictment in 19-466,

10   defendants Rolando Antuain Williamson, Adrien Hiram Taylor,

11   Ishmywel Calid Gregory, and Hendarius Lamar Archie are charged

12   with violating 21 USC 846, 841(a)(2), 841(b)(1)(a) and

13   841(b)(1)(b).

14        Section 841(a)(1) makes it a crime for anyone to knowingly

15   possess heroin, cocaine hydrochloride, methamphetamine,

16   fentanyl, or marijuana with the intent to distribute it.

17   Section 846 makes it a separate crime for anyone to conspire to

18   distribute heroin, cocaine hydrochloride, methamphetamine,

19   fentanyl, or marijuana. A conspiracy is an agreement by two or

20   more persons to commit an unlawful act. In other words, it's

21   kind of a partnership for criminal purposes, so every member of

22   the conspiracy becomes the agent or partner of every other

23   member. The government does not have to prove that all of the

24   people named in the superseding indictment were members of the

25   plan or that those who were members made any formal agreement.

1  The heart of the conspiracy is the making of the unlawful plan

2  itself. So the government does not have to prove that the

3  conspirators succeeded in carrying out that plan.

4       These defendants can be found guilty only if all of the

5  following facts are proved beyond a reasonable doubt: First,

6  that two or more people in some way agreed to try to accomplish

7  a shared and unlawful plan, the object of which was to

8  distribute heroin, cocaine hydrochloride, methamphetamine,

9  fentanyl, and or marijuana; the second element is that the

10 defendants knew of the unlawful purpose of the plan and

11 willfully joined it; and finally, that the object of the

12 unlawful plan was to distribute one kilogram or more of a

13 mixture and substance containing a detectable amount of heroin,

14 5 kilograms or more of a mixture and substance containing a

15 detectable amount of cocaine hydrochloride, 50 grams or more of

16 methamphetamine, 40 grams or more of a mixture and substance

17 containing a detectable amount of what is more commonly

18 referred to as fentanyl -- I'm going to slaughter the actual

19 name here -- N-phenyl-N-(1-(2-phenethyl)-4-piperidinyl,

20 100 kilograms or more of a mixture and substance containing a

21 detectable amount of marijuana.

22      A person may be a conspirator even without knowing all the

23 details of the unlawful plan or the names and identities of all

24 of the alleged conspirators. If a defendant played only a minor

25 part in the plan but had a general understanding of the

1  unlawful purpose of the plan and willfully joined in the plan

2  on at least one occasion, that is sufficient for you to 942(c)

3  the defendant guilty. But simply being present at the scene of

4  an event or merely associating with certain people or

5  discussing common goals and interests, doesn't establish proof

6  of a conspiracy. Also, a person who doesn't know about a

7  conspiracy, but happens to act in a way that advances some

8  purpose of one, doesn't automatically become a conspirator.

9       The defendants are charged with possessing with intent to

10 distribute and distributing at least 1 kilogram of a mixture

11 and substance containing a detectable amount of heroin; 5

12 kilograms or more of a mixture and substance containing a

13 detectable amount of cocaine hydrochloride; 15 grams or more of

14 methamphetamine; 40 grams or more of a mixture and substance

15 containing fentanyl, a detectable amount of fentanyl; and

16 100 kilograms or more of a mixture and substance containing a

17 detectable amount of marijuana. But you may 942(c) any

18 defendant guilty of the crime even if the amount of the

19 controlled substances for which he can be held responsible is

20 less than those amounts. So if you 942(c) any defendant guilt

21 you must also 942(c) whether the government has proved beyond a

22 reasonable doubt the weight of the specific controlled

23 substance or substances the defendant conspired to distribute

24 and specify those amounts on the verdict form.

25       Additionally, defendants Taylor and Gregory are each

1  charged with having committed this offense after he had one or
2  more final convictions for a series drug felony. But you may
3  942(c) each defendant guilty of the crime even if you 942(c) he
4  did not have a final conviction for a serious drug felony at
5  the time he committed the offense. If you 942(c) the defendant
6  guilty, you must also unanimously agree that he had a final
7  conviction for a serious drug felony and specify the finding on
8  each verdict form.
9       I'll remind you, the United States, Mr. Taylor, Mr.
10 Gregory have stipulated to the -- forgive me -- let me go back.
11 No. They have stipulated to the facts that Mr. Taylor has two
12 serious drug felonies and that Mr. Gregory has had one serious
13 drug felony. So you should consider those facts proven beyond a
14 reasonable doubt. But I do want to caution you that these prior
15 felony convictions cannot be considered as evidence that they
16 are guilt of the offense charged in Count 2.
17      In Count 3, defendant Rolando Antuain Williamson is
18 charged in the superseding indictment with violating 21 USC
19 841(a)(1) and (b)(1)(d), which makes it a federal crime for
20 anyone to possess a controlled substance with the intent to
21 distribute it.
22      In Count 5, defendant Rolando Antuain Williamson is
23 charged in the superseding indictment with violating 21 USC
24 841(a)(1), (b)(1)(a), (b)(1)(b), and (b)(1)(d), which makes it
25 a federal crime for anyone to possess a controlled substance

1   with the intent to distribute it.

2       In Count 6, Mr. Williamson is charged with violating 21

3   USC 841(a)(1)(a) -- I'm sorry -- yes, (a)(1), (b)(1)(b), and

4   (b)(1)(d) in the superseding indictment, which makes it a

5   federal crime for anyone to possess a controlled substance with

6   the intent to distribute it.

7       In Count 1 of case 20-151, defendant Hendarius Lamar

8   Archie is charged with violating 21 USC 841(a)(1), (b)(1)(c),

9   and (b)(1)(d), which makes it a federal crime for anyone to

10  possess a controlled substance with intent to distribute it.

11  Heroin, methamphetamine, amphetamine, cocaine hydrochloride,

12  fentanyl, and marijuana are controlled substances.

13      Each defendant can be found guilty of the crimes charged

14  only if the following facts are proved beyond a reasonable

15  doubt for each count: That the defendant knowingly possessed a

16  controlled substance; that the defendant intended to distribute

17  the controlled substance; that the weight of the substance the

18  defendant possessed was as charged or a lesser amount; and that

19  the -- those are the three elements.

20      The defendant knowingly possessed the controlled substance

21  if: Number one, he knew that he possessed a substance listed on

22  the federal schedules of controlled substances, even if he did

23  not know the identity of that substance, or the defendant knew

24  the identity of the substance that he possessed even if he

25  didn't know the substance was listed on the federal schedules

1   of controlled substances.

2       To intend to distribute is to plan to deliver possession

3   of a controlled substance to someone else even if nothing of

4   value is exchanged. Several of these counts also charge the

5   defendant with possessing with the intent to distribute a

6   specific about of a controlled substance. Count 5 charges Mr.

7   Williamson with intending to distribute 500 grams or more of a

8   mixture and substance containing a detectable amount of

9   methamphetamine and/or 100 grams or more of a mixture and

10  substance containing a detectable amount of heroin. But you may

11  942(c) Mr. Williamson guilty of the crime even if the amount of

12  the controlled substances for which he should be held

13  responsible are less than those amounts.

14      So if you 942(c) Mr. Williamson guilty, you must also

15  942(c) whether the government has proved beyond a reasonable

16  doubt the weight of methamphetamine and heroin the defendant

17  possessed and specify the amount on the verdict form. Count 6

18  charges Mr. Williamson with possessing with the intent to

19  distribute 100 grams or more of a mixture and substance

20  containing a detectable amount of heroin and/or 40 grams or

21  more of a mixture and substance containing a detectable amount

22  of fentanyl, also known as

23  N-phenyl-N-(1-(2-phenethyl)-4-piperidinyl, but you may 942(c)

24  Mr. Williamson guilty of the crime even if the amount of the

25  controlled substances for which he should be held responsible

1    is less than those amounts. So if you 942(c) Mr. Williamson

2    guilt, you must also 942(c) whether the government has proved

3    beyond a reasonable doubt the weight of the heroin and fentanyl

4    the defendant possessed and specify that amount on the verdict

5    form.

6         In Count 8 of the superseding indictment in 19-466,

7    defendant Williamson is charged with violating 21 USC 841(a)(1)

8    and (b)(1)(c), which makes it a federal crime for anyone to

9    distribute a controlled substance.

10        In Count 11 of the superseding indictment in 19-466,

11   defendant Adrien Hiram Taylor is charged with violating title

12   21 USC 841(a) and (b)(1)(a), which makes it a federal crime for

13   anyone to distribute a controlled substance.

14        In Count 12 of the superseding indictment in 19-466,

15   defendant Taylor is charged with violating 21 USC 841(a)(1) and

16   (b)(1)(b), which makes it a federal crime for anyone to

17   distribute a controlled substance.

18        In Count 13 of the superseding indictment in 19-466,

19   defendant Ishmywel Calid Gregory is charged with violating 21

20   USC 841(a)(1) and (b)(1)(c), which makes it a federal crime for

21   anyone to distribute a controlled substance.

22        Heroin, fentanyl, methamphetamine, and cocaine

23   hydrochloride are controlled substances. The defendants can be

24   found guilty of each of the crimes identified only if all of

25   the following facts are proved beyond a reasonable doubt in

 1   each count: First, that the defendant knowingly possessed a
 2   controlled substance; second, the defendant distributed the
 3   controlled substance; and finally, that the weight of the
 4   substance the defendant distributed was as charged or a lesser
 5   amount. The defendant knowingly possessed the controlled
 6   substances if he knew he possessed substances listed on the
 7   federal schedule of controlled substances, even if he didn't
 8   know the identity of the substance or he knew that the -- or he
 9   knew the identity of the substance he possessed even if he did
10   not know that the substances were listed on the federal
11   schedule of controlled substances.
12        To distribute is to deliver possession of a controlled
13   substance to somebody else, even if nothing of value is
14   exchanged. Pardon me.
15        In Count 11, Mr. Taylor is charged with distribution of at
16   least 50 grams of methamphetamine, but you may 942(c) the
17   defendant guilty of the crime even if the amount of controlled
18   substances for which he should be held responsible is less than
19   that amount. So if you 942(c) Mr. Taylor guilty, you must also
20   942(c) whether the government has proved beyond a reasonable
21   doubt the weight of the methamphetamine that Mr. Taylor
22   possessed and specify that amount on the verdict form.
23        In Count 12, Mr. Taylor's charged with the distribution of
24   at least 5 grams of methamphetamine, but you may 942(c) the
25   defendant guilty of the crime even if the amount of the

1   controlled substance for which he is held responsible is less

2   than that amount. So if you 942(c) Mr. Taylor guilty, you must

3   also 942(c) whether the government proved beyond a reasonable

4   doubt the weight of the controlled substance he possessed, and

5   then, specify that amount on the verdict form.

6        In Count 1 of the indictment in 20-405, the defendant

7   Rolando Antuain Williamson is charged with violating 18 USC

8   924(c)(1)(a), which makes it a separate federal crime to

9   possess a -- or use a -- I'm sorry -- to possess, use, or carry

10  a firearm during and in relation to a drug trafficking crime.

11  Mr. Williamson can be found guilty of this crime only if all of

12  the following facts are proven beyond a reasonable doubt:

13  First, that Mr. Williamson committed the drug trafficking

14  crimes charged in Counts 1, 2, and 3 of the indictment, and

15  that during and in relation to that crime, the defendant

16  knowingly used or carried a firearm as charged in the

17  indictment.

18       A firearm is any weapon designed to or readily convertible

19  to expel a projectile by the action of an explosive. The term

20  includes the frame or receiver of any such weapon or any

21  firearm muffler or silencer. To use a firearm means more than a

22  mere possession and more than proximity and accessibility to

23  the firearm. It requires active employment of the firearm by

24  brandishing or displaying it in some fashion. To carry a

25  firearm is to have a firearm on one's person or to transport

1  the firearm, such as in a vehicle, from one place to another
2  while committing drug trafficking crime. To use or carry a
3  firearm in relation to a crime means that the firearm had some
4  purpose or effect with respect to the crime and was not there
5  by accident or coincidence. The firearm must have facilitated
6  or had the potential of facilitating the crime.

7      In Count 7, defendant Rolando Antuain Williamson is
8  charged with violating Title 18 USC 924(c)(1)(a), which makes
9  it a separate federal crime to possess a firearm in furtherance
10 of a drug trafficking crime. Mr. Williamson can be found guilty
11 of this crime only if all of the following facts are proved
12 beyond a reasonable doubt: First, that Mr. Williamson committed
13 the drug trafficking crime charged in Count 6 of the
14 superseding indictment and that Mr. Williamson knowingly
15 possessed a firearm in furtherance of that crime as charged in
16 the indictment.

17     A firearm is any weapon designed to or readily convertible
18 to expel a projectile by the action of an explosive. The term
19 includes the frame or the receiver of any such weapon or any
20 firearm muffler or silencer. To possess the firearm is to have
21 direct physical control of the firearm or to have knowledge of
22 the firearm's presence and the ability and intent to later
23 exercise control of the firearm. Possessing a firearm in
24 furtherance of the crime means that the firearm helped,
25 promoted, or advanced a crime in some way.

1     In Count 2 of 20-151, defendant Hendarius Lamar Archie is

2  charged with violating 18 USC 924(c)(1)(a), which makes it a

3  separate federal crime to possess a firearm in furtherance of a

4  drug trafficking crime. Mr. Archie can be found guilty of this

5  crime only if all of the following facts are proven beyond a

6  reasonable doubt: Number one, that Mr. Archie committed the

7  drug trafficking crime charged in Count 1 of 20-151 and that

8  Mr. Archie knowingly possessed a firearm in furtherance of that

9  crime as charged in the indictment.

10     As I've already said, a firearm is any weapon designed to

11  or readily convertible to expel a projectile by the action of

12  an explosive. The term includes the frame or receiver of any

13  such weapon or a muffler or silencer. To possess a firearm is

14  to have direct physical control of the firearm or to have

15  knowledge of the firearms presence and the ability and intent

16  to later exercise control over the firearm. Possessing a

17  firearm in furtherance of a crime means the firearm helped,

18  promoted, or advanced the crime in some way.

19     The following instruction involves use of a communication

20  facility in violation of 21 USC 843(b), which makes it a

21  separate federal crime for anyone to knowingly use a

22  communication facility to commit or help commit another crime

23  violating Section 846 and 841(a)(1) as charged in Count 2 of

24  the superseding indictment in 19-466.

25     The superseding indictment charges defendant Adrien Hiram

 1   Taylor with this offense in Counts 20, 21, and 22. Defendant
 2   Rolando Antuain Williamson is charged with the same offense in
 3   Counts 34, 35, 39, 40, and 41. Each defendant can be found
 4   guilty of each charged offense of unlawful use of a
 5   communication facility only if, for each count, all of the
 6   following facts are proved beyond a reasonable doubt: The
 7   defendant used a communication facility; the defendant used the
 8   facility while committing or helping to commit the crime
 9   charged in Count 2, which is conspiracy to distribute drugs;
10   and finally, that the defendant acted knowingly and
11   intentionally.
12        The term "communication facility" includes all mail,
13   telephone, radio, wire, and computer-based communication
14   systems. To help to commit a crime means to use a communication
15   facility in anyway that makes committing the crime easier or
16   possible. It doesn't matter if the crime was successfully
17   carried out.
18        In Count 1, defendant Rolando Williamson is charged with
19   the violation of 21 USC 848, which makes it a federal crime for
20   anyone to participate in a continuing criminal enterprise
21   involving controlled substances. Title 21 USC 846 makes it a
22   crime for anyone to conspire to distribute controlled
23   substances in violation of 21 USC 841(a)(1) as charged in Count
24   2 of the superseding indictment. 21 USC 841(a)(1) makes it a
25   crime for anyone to knowingly distribute or possess with intent

1   to distribute heroin, methamphetamine, fentanyl, or marijuana
2   as charged in Counts 3, 5, 6, and 8 of the superseding
3   indictment. I'll remind you that fentanyl is also known as
4   N-phenyl-N-(1-(2-phenethyl)-4-piperidinyl-propanamide. Title 18
5   USC 924(c)(1)(a) makes it a crime for anyone during and in
6   relation to a drug trafficking crime to use or carry a firearm
7   or to possess a firearm in furtherance of a drug trafficking
8   crime as charged in Count 7 of the superseding indictment and
9   Count 1 of the indictment in 20-405.
10      Title 21 USC 843 makes it a crime for anyone to knowingly
11  use a communication facility to commit or help commit another
12  crime violating 841(a)(1)(a) as charged in Counts 34, 35, 39,
13  40, and 41. Mr. Williamson can be found guilt of this crime
14  only if the following facts are proved beyond a reasonable
15  doubt: First, that Mr. Williamson is guilt of at least three of
16  the following counts: Count 2, 3, 5, 6, 7, 8, 34, 35, 39, 40,
17  or 41 of Case Number 19-466 and Count 1 of Case Number 20-405.
18      The second element the government must prove is the
19  violations were a part of a continuing series of violations.
20  Third, they have to prove beyond a reasonable doubt that Mr.
21  Williamson participated in a continuing series of violations
22  together with at least five other people for whom he was an
23  organizer or supervisor or manager, and Mr. Williamson got
24  substantial income or resources from the continuing series of
25  violations.

1       And finally, that Mr. Williamson was a principal

2   administrator or organizer or leader of the enterprise, and

3   that the weight of the methamphetamine involved in the crime

4   was at least 1500 grams.

5       A continuing series of violations means proof of at least

6   three related violations of the federal controlled substances

7   laws as charged in Count 2, 3, 5, 6, 7, 8, 34, 35, 40, and 41

8   of the superseding indictment in 19-466 and Count 1 of 20-405.

9   Plus, proof that the violations were connected as related

10  ongoing activities rather than isolated or disconnected acts,

11  and you must unanimously agree on which three or four

12  violations Mr. Williamson committed, which will be indicated by

13  your verdicts in each of those counts.

14      The government must prove that Mr. Williamson engaged in

15  the continuing series of violations with at least five other

16  people. It doesn't matter whether those persons are named in

17  the superseding indictment or whether the same five or more

18  people participated in each crime or participated at different

19  times. The government must also prove that Mr. Williamson was

20  an organizer, supervisor, or manager and either organized or

21  directed the activities of the others. In other words, Mr.

22  Williamson must have been more than an mere fellow worker. It

23  doesn't matter whether Mr. Williamson was the only organizer or

24  supervisor or whether Mr. Williamson delegated authority to a

25  subordinate and didn't have personal contact with each of the

1  people whom he organized, supervised, or managed through

2  directions given to someone else.

3      The government must prove that Mr. Williamson obtained

4  substantial income or resources from the continuing series of

5  violations. Substantial income or resources means significant

6  sizes or amounts of money or property, but not necessarily any

7  profit that Mr. Williamson received from the crimes, not some

8  relatively insubstantial insignificant trivial amounts or

9  sizes.

10      At this point, before I give the attorneys an opportunity

11  to present their closing arguments, I want to go over, briefly,

12  the verdict form with you. You'll see that for each count there

13  is a separate piece of paper. It will identify the count

14  number. It will say that the jury finds whatever the defendant

15  is, and there's a box to check guilty or not guilty, and you

16  would mark them as an X. And then, the foreperson would date

17  and sign that form on each page.

18      You will note that some of these verdict forms are longer

19  than others. If you 942(c) the defendant not guilty, you do not

20  have to go any further than checking that not guilty mark. If

21  you 942(c) the defendant guilty, then you have to go through

22  the drugs and the weight. I believe that that is it. With that,

23  I will allow the government to present its closing arguments.

24          MR. ALBEA: Can we approach just briefly? Housekeeping

25  matter.

```
 1              THE COURT: Yes.
 2              JUROR: Your Honor, may I go to the restroom while
 3  you --
 4              THE COURT: You may.
 5              (Bench conference on the record, as follows:)
 6              THE COURT: If you were happy with it will -- you're
 7  satisfied with the way I instructed the jury?
 8              MR. ALBEA: Mr. Gregory is.
 9              MR. WOODFIN: Well, reserving our proposed instruction,
10  we do not have any objection to the way the instructions were
11  made.
12              MR. GARDNER: What was the question?
13              MS. WALLACE: Any objections to the way instructions
14  were read?
15              MR. GARDNER: No, Your Honor. Thank you.
16              MS. WALLACE: None from Mr. Archie.
17              MR. DIMLER: No. I forgot to take out Count 4, that was
18  the 924(c), so I have that.
19              THE COURT: That reminds me.
20              MR. DIMLER: I just want to make sure y'all were okay
21  with it.
22              THE COURT: That reminds me that we don't have copies
23  of the indictments in another two cases with the redactions --
24              MR. DIMLER: We did. We redacted those as well.
25              THE COURT: Oh, okay. See, I made that up.
```

1            MR. DIMLER: We did author it. The only one that was

2     messed up was that one count in the superseding indictment, and

3     Trey caught it.

4            THE COURT: Got it. Thank you.

5            MR. ALBEA:  The only other issue is, given the time,

6     which is a little before 11:30.

7            THE COURT: Is it?

8            MS. WALLACE: It's 11:26.

9            MR. ALBEA: What we don't want is the government to

10    close and break.

11           THE COURT: Yeah. Okay. I'm sorry. Thank you so much

12    for noticing that. They don't have a clock back there.

13           MS. WALLACE: It's crazy. Okay.

14           MR. ALBEA: I'm fine just going all the way through. I

15    don't care. I just don't want to break after they close.

16           MS. WALLACE: Mr. Cross objects.

17           THE COURT: He objects?

18           MS. WALLACE: Mr. Cross does. He's ready to go home.

19           THE COURT: Okay. That was a joke for the record. Okay.

20    Let me ask y'all one question: Do you -- I'm not going to

21    instruct them on the forfeiture now, but do we need to tell

22    them that they have the forfeiture?

23           MR. DIMLER: I think you can tell them. It's just --

24    what is on the forfeiture?

25           MR. CROSS: Kings Ranch and ammunition.

 1          MR. DIMLER: Kings Ranch and ammunition.

 2          MS. WALLACE: And then, in Archie's case, you have the

 3    gun.

 4          MR. WOODFIN: Sorry. Judge, I think if I could speak to

 5    you, after -- or if we're back to break, maybe I could speak to

 6    him about the forfeiture and that might or might not, but it

 7    will at least give us a direction on --

 8          THE COURT: Okay. That's fine. That's a good idea.

 9    Thank you so much. All right.

10          Ladies and gentlemen, on having thought about it, I think

11    it might be better so that we don't have to separate out the

12    arguments if we go ahead and adjourn for lunch a little early

13    today. So why don't we do this. It is 11:30. Why don't we meet

14    back here or back in the jury room, I should say, at 12:30,

15    okay? Thank you.

16              (Jury out and recess began at 11:28 a.m.)

17              (Jury in and recess ended at 12:37 p.m.)

18          THE COURT: Good afternoon. I think we are at the point

19    in the trial where we are ready to hear the closing arguments

20    of counsel. If the United States would like to present their

21    closing argument.

22          MR. DIMLER: Thank you, Your Honor. Ladies and

23    gentlemen of the jury, good afternoon. It's been my pleasure,

24    as well as AUSA Jonathan Cross, to represent the United States

25    in this case. We thank you for your time and attention.

1   Appreciate everything you've done here. This is an important
2   case both for the defense and for the government. I feel like
3   you all should get a medal for having sat through seven
4   chemists and a fingerprint expert. But these things are all
5   important, and there's a reason why we called each one of these
6   witnesses.
7       I want to talk with you now. My job is to sort of go
8   through the elements of the offenses, talk with you about those
9   elements, and then talk with you about some of the facts, the
10  exhibits, and the witnesses that you've heard from and why we
11  believe that we've met the elements of each and every offense.
12      I want to talk with you, first, about the elements of
13  distribution of a controlled substance that's referenced. And
14  by the way, before I get into this, one of the things the judge
15  is going to give you -- my understanding is that the judge will
16  give you a copy of the instructions, which will be helpful so
17  that, if you need to go over them again, that will be helpful.
18  You'll also get redacted copies of the superseding indictment
19  we referred to and the two other additional indictments that
20  were joined in this case. So, hopefully, these numbers won't be
21  meaningless to you.
22      Counts 8, 11, 12, and 13 have to do with distribution of a
23  controlled substance. Essentially, a defendant has to knowingly
24  possess a controlled substance and then distribute it.
25  Distribution simply means the transfer of possession. You don't

 1   have to make any money. It doesn't have to have any other

 2   enumeration. It's simply the transfer of possession. So with

 3   almost all of these charges -- so, for example, if you see a

 4   charge that says a mixture and substance containing a

 5   detectable amount of, whatever, heroin, methamphetamine,

 6   cocaine hydrochloride, that's an instance where you won't have

 7   to make an independent finding -- excuse me -- of weight.

 8        In those cases where there's a charged amount, so for

 9   example, it may say 50 grams or more of methamphetamine or 1

10   kilogram or more of heroin, you'll have choices to make, and

11   those choices will be based on the evidence that we presented.

12   One of the things that you're going to have to do is take a

13   look at the lab reports that were admitted into evidence

14   through the chemists and match those lab reports with the drug

15   exhibits. And I know that you all paid very good attention so

16   you'll know what those drug exhibits -- how they married up

17   against the charges.

18        So let's talk about this: The controlled purchase from

19   Adrien Taylor. As you will recall, there were two controlled

20   purchases that were done on April 30th. Count 12 represents

21   that first controlled purchase. This is an instance where

22   Taylor sold over 2 ounces of methamphetamine. You have a lab

23   report that reflects the methamphetamine. If you don't know

24   this, 1 ounce is about 28 grams. So we've charged that it's

25   over 5 grams, and it is, in fact, over 5 grams.

1    How do you know that this happened? Well, you heard the

2 testimony of Special Agent Gerhardt who told you, as well as

3 Task Force Officer Washington, who told you what a controlled

4 purchase is. They searched the source before, searched the

5 source after, provided the source with money, made sure they

6 don't have any other drugs, follow them to the meet location.

7 They place a body wire and a live transmitter on the source, so

8 that they can hear what's going on.

9    In addition to that, you all know that the calls leading

10 up to these buys with Mr. Taylor and Mr. Gregory were, in fact,

11 to Mr. Taylor and Mr. Gregory because you know that those are

12 the same telephone facilities on which the FBI conducted

13 wiretap operations. And so that was confirmed that way.

14    Count 13, this is the sale to Mr. Gregory. You'll recall,

15 this is about half ounce of cocaine. This is an instance of

16 where the actual charge itself will simply tell you cocaine

17 hydrochloride, an amount. You won't be asked to 942(c) a weight

18 on that. It will just be a yes or no decision in terms of your

19 verdict. How do you know that that happened? Well, the same

20 reason that you know that the controlled purchase with Mr.

21 Taylor occurred, because it happened in the same manner on the

22 same day.

23    I noticed counsel, at the beginning of the case at opening

24 statement, said that he had conceded that. I don't know if he

25 will say the same thing or not, but regardless, you have the

 1  evidence before you to make that finding. Controlled purchase
 2  from Williamson, this is, if you recall, when the FBI sent in
 3  their cooperating witness. Remember, the pole camera? There was
 4  a person that went in the house with Mr. Williamson. There's a
 5  really extensive transcript from that interaction, and I would
 6  urge you to read that transcript. Obviously, the judge has told
 7  you in her instructions that the ultimate evidence is the
 8  audio. So if you feel it necessary, play the audio and compare
 9  it to the transcript. We're very confident that the transcripts
10  are as accurate as possible. But that's ultimately for you all
11  to decide.
12      This was a really critical meeting. Not only did we get a
13  sample, a very small sample of heroin and fentanyl that was
14  given to the cooperating source by Mr. Williamson, but it also
15  detailed a lot of the history of Mr. Williamson with this
16  particular person who, as you heard, was a drug courier or a
17  mule from Mexico on behalf of an individual named Meme who
18  would later show up in some text messages with Mr. Williamson
19  from his telephone.
20      Controlled purchase from Taylor on June 19th, 2019, this
21  is one, you may recall, where there was a video, phone was
22  facing the wrong way. Instead of Mr. Taylor coming up on the
23  driver's side. He came up on the passenger side but it's still
24  a pretty good video because what it shows you is that there's a
25  person he's meeting with, and you know who person is because

 1   you have the calls leading up to it, and you can see a handoff
 2   at that point.
 3        All right. Possession with intent to distribute. So here's
 4   what differentiates distribution from possession with the
 5   intent to distribute. Distribution is where the actual transfer
 6   of drugs occurs. Possession with the intent to distribute is
 7   where someone possesses an amount and later intends to
 8   distribute that amount. So if you think of it this way, in a
 9   controlled purchase, it's almost always a distribution. In a
10   search warrant, it's almost always possession with the intent
11   to distribute, because when you go in on a search warrant, you
12   go into a house, the drugs haven't been delivered to anybody
13   yet, but they're still there.
14        The defendant knowingly possessed it. The defendant
15   intended to distribute it. How do you determine whether a
16   defendant intended to distribute it? Well, it's not personal
17   use amount, right? So when you go into Mr. Williamson's -- I'll
18   click down here -- when you look at say, for example, this, the
19   search warrant at 1200 Oaks, 128.9 grams of fentanyl. That's a
20   massive amount of fentanyl, right? So you can make that
21   determination simply on the basis of how much drugs were there.
22        I go back -- of course, the weight. Again, sometimes
23   you'll be asked to 942(c) the weight. In those instances where
24   you do, where we've asked you to 942(c) a weight, there will be
25   a lab report that will exceed that amount. As long as you link

1  that up, you will 942(c) it.

2       Use and carry a firearm during and in relation to. So

3  there's two theories of prosecution under what we call 924(c).

4  One is this one, which is use and carry a firearm during and in

5  relation to a drug trafficking offense. Think of it this way to

6  differentiate the two theories: The judge told you about actual

7  possession and constructive possession. In this instance, it's

8  actual possession. So this is where someone has a gun on their

9  person or, as the instruction says, has a gun in their car, and

10  they're in the process of conducting some type of a drug

11  transaction.

12       So in this particular instance of 20-cr-405, the defendant

13  in this case, Mr. Williamson, is alleged to have carried a

14  firearm, and this is the time when the firearm was in the car.

15  There was a firearm in the Hellcat, and there was also a

16  firearm on his person when he got arrested. During and in

17  relation to that crime, the defendant knowingly used or carried

18  the firearm.

19       Here's some definitions. This is what it means to carry

20  it: To have it on one's person or to transport it in a vehicle.

21  For it to be done in relation to, means that the firearm had

22  some purpose or effect with respect to the crime. Well, what

23  evidence do you have of that? One of the things that you heard,

24  I believe when Patrick McSwain testified, was I asked him, you

25  know, why do drug dealers carry guns? If you were to get your

1    drugs stolen, would you go to the police? And he kind of
2    laughed. I think the reason he laughed is because what he
3    realizes is that the reason that drugs and guns go together is
4    because drugs are something that are very valuable, and you
5    absolutely cannot go to the police about it. If it gets stolen,
6    that's it. So you have a gun to protect those drugs.

7        Talking about Mr. Williamson's arrest on August 22nd, this
8    is Counts 3 and 4. In Count 3, this is in relation to the drugs
9    that were fount in the vehicle at the inventory search as well
10   as the gun. There was a Glock 23 .40-caliber that I believe was
11   discovered in the inventory search, but there was also a
12   Colt .380 that was in his pocket. This was alleged to have --
13   the underlying drug offense is alleged, not only with regard to
14   Count 3, but I believe with the conspiracy in general. How is
15   he in the process of drug trafficking? Well, he's accused of
16   conspiracy, and he's got drugs on him, and he's got a pretty
17   large amount of money.

18       Possession of a firearm in furtherance of a drug
19   trafficking offense. This is the search of 1200 Oaks Drive.
20   First, Mr. Williamson committed the drug trafficking, crime
21   charged in Count 6, and that Mr. Williamson knowingly possessed
22   a firearm in furtherance. So this is the alternative theory,
23   right? This is where the guns are not on the person, in the
24   vehicle, but say, for example, they're in a house. So the
25   distinction between actual and constructive possession is this:

1  When your carrying the firearm, it's on your person or in your
2  vehicle; when it's possession of a firearm in furtherance, it's
3  constructive possession. And the judge instruct you that
4  constructive possession is where you don't have the actual
5  physical possession of the item, but you have to intend to take
6  possession of it at a later date.
7      So what we're talking about here is this particular search
8  warrant at the apartment at 1200 Oaks Drive. There was
9  128.9 grams of fentanyl laced with heroin. How do you know Mr.
10 Williamson possessed this with the intent to distribute it?
11 Well, three separate fingerprints from his ten fingers were on
12 the Huggies box that contained these drugs. There was roughly
13 50 pounds of marijuana there. There were four rifles and over
14 400 rounds of ammunition. And, of course, there was cash, and
15 there was expensive jewelry.
16     You know, one of the things that you're going to be
17 required to do in this case is exercise your common sense.
18 Exercise your reason, and ask yourself, why did he have four
19 rifles and 1400 rounds of ammunition? And I would say to you
20 that the reason he had that is because he realized that this
21 stuff is valuable and that it needed to be protected, and
22 that's exactly what this statute was designed for.
23     Search warrant at 1808 Arlington, August 22nd, Count 5,
24 during this search there was recovered 500 grams of
25 methamphetamine. This is another instance where it's possession

1  with intent to distribute, and you'll be required to 942(c) a

2  particular weight. There is a lab report that corresponds with

3  the methamphetamine that exceeds 500 grams, 131 grams of

4  heroin, and roughly, 50 pounds of marijuana. And again, there

5  was a good number of rounds of ammunition.

6      This is the arrest of Hendarius Archie. What you're going

7  to see is you're going to have three separate redacted

8  indictments. The first is the large superseding indictment. The

9  second is an indictment that just contains a 924(c) charge with

10  regard to Mr. Williamson, and that has to do with the date of

11  his arrest. And the third has to do with this arrest of Mr.

12  Archie. I think you may remember some of this testimony. Mr.

13  Archie was not wearing pants, and they went back and that was

14  when they found the marijuana, the pills, and a loaded Glock

15  and $488.

16      The use of a telephone to facilitate a drug trafficking

17  crime. This is in Counts 20, 21, 22, 34, 35, 39, 40, and 41.

18  This is essentially -- and I styled it use of a telephone to

19  facilitate. I believe it actually says a communication facility

20  in the instruction. But what you'll see in the instruction is

21  that the definition for a communication facility includes a

22  telephone. And in each of these instances, the telephone that

23  was used was based on wire -- intercepted wiretap

24  communications.

25      So when you get the redacted indictment, you'll have the

1   counts, and those counts will correspond with -- the easiest

2   way to do it is to take the transcript, the count has a time

3   and a date for who the call is, and it also has who the

4   participants are. And when you look at that transcript, you'll

5   see that it matches up, and that's how you'll know which one

6   you're looking at.

7        This is a summary. These are the counts. On the left side,

8   the date, the time, the defendants, and the exhibit. And as I

9   told you, that will line up pretty easily. It's too much to go

10  through now, but it will line up pretty easily when you look at

11  the transcripts and compare those to what's left on the

12  indictment.

13       All right. Conspiracy to distribute and possess with

14  intent to distribute. This is really the heart of the case.

15  What makes conspiracy is that two or more people in some way

16  agree to accomplish a shared and unlawful plan, the object of

17  which is to distribute these various drugs; that the defendants

18  knew of the unlawful purpose of the plan and joined it; and

19  that the unlawful purpose of the plan was to do these sort of

20  substantive crimes that we talked about.

21       A couple of things that you need to really know from the

22  instructions that the judge gave you is that a conspiracy is an

23  agreement between two or more persons. This is important. The

24  government does not have to prove that all of the people named

25  in the superseding indictment were members of the plan or that

1  those who were members made any formal type of agreement. One
2  of the things that you're going to see, and I think you've
3  picked up on this already based on the testimony that you've
4  heard from the cooperating defendants, but there are only four
5  individuals here at trial today. You are not required to
6  determine whether those four individuals have formed a
7  conspiracy overall. It is possible that you could say, well --
8  and one of the things that was argued and I think pointed out
9  well was that Mr. Williamson and Mr. Taylor did not like one
10 another and that Mr. Taylor and Mr. Williamson did not do drug
11 deals together. You don't have to make that finding.
12     It is sufficient that you 942(c) that there was one plan,
13 the object of that plan was to deal drugs, and that these
14 individuals joined in. A person may be a conspirator without
15 even knowing the details of the unlawful plan or the names or
16 identities of all the alleged co-conspirators. So it isn't
17 required that you focus in on these four individuals. You're
18 going to see a much longer list.
19     One of the other things that the indictment says, and I
20 want to point this out to you, is that it alleges not only a
21 conspiracy between the named individuals, but it also has a
22 phrase in it that says, "with others both known and unknown to
23 the grand jury". In other words, there can be people who aren't
24 listed as conspirators in the indictment who are still
25 conspirators.

1        Let me give you an example. One of the individuals that
2   you heard from was Demarcus Whitt. He was first cooperating
3   defendant. Demarcus Whitt, I think you picked up from his
4   testimony, pled guilty in a federal drug case.
5   It was not this drug case. Patrick McSwain is another example
6   of an individual who was in this -- I think you heard he was
7   investigated by the DEA, prosecuted by our office from the DEA,
8   but in a separate indictment. That doesn't mean he's not still
9   a conspirator. That doesn't mean he wasn't still involved in
10  this conspiracy. Had he testified extensively about his drug
11  dealing activities with Mr. Gregory.
12       Okay. I put this up just to show you some of the
13  individuals who are named in the indictment that you'll see. I
14  put just about every name you heard from. Mr. Archie, who is
15  here; Janaya Bibb; Christopher Cooke; Errick Daniel; Leanthony
16  Gillins; Mr. Gregory; the Hatter brothers; Antonius Hayes;
17  Darius Johnson; you heard from Kenneth Johnson; there's another
18  individual named Sirterrious Lee; you heard the name Yolanda
19  Milton; Tevion Poole, who is in the video with Mr. Williamson;
20  Adrien Taylor, who is here; Isiah Thomas, who testified before
21  you; and, obviously, Mr. Williamson.
22       You heard from Demarcus Whitt. We called cooperating
23  defendants who testified about their knowledge of their portion
24  of the conspiracy, and, again, it isn't required in a
25  conspiracy for these folks, 25 folks, to get together and have

1  a meeting and sit down and say, All right. Let's have our board

2  meeting today. Let's plan out our drug trafficking activities

3  for the next month.

4      It's sufficient that there is a plan and that that plan

5  is to deal illicit drugs and that these individuals joined in

6  that plan. Demarcus Whitt testified and told you that he both

7  bought and sold drugs from Ishmywel Gregory. In addition to

8  that, he talked about an individual named Isaac Robinson, and

9  Isaac Robinson becomes important later.

10      The testimony of Patrick McSwain: Patrick McSwain

11  talked about, if you recall, that he was initially buying drugs

12  from Mr. Gregory, but eventually, got source of supply out of

13  Mexico where he was able to move essentially massive quantities

14  of drugs, and then he was selling a lot of those drugs to Mr.

15  Gregory and that he knew that Mr. Gregory and Mr. Williamson

16  had a relationship, both because he's seen Mr. Williamson show

17  up at Mr. Gregory's residence to do a heroin deal, but in

18  addition to that, when they ended up in the same facility, they

19  had conversations about Mr. Gregory and about their drug

20  trafficking relationship.

21      The testimony of Kenny Johnson: Kenny Johnson, ladies

22  and gentlemen, low level drug dealer, just doing little stuff

23  here and there, but he got essentially almost all of his drugs

24  from Mr. Taylor. You know this. You heard from Kenny Johnson.

25  You heard the wiretap calls. You know, one of the things that I

1  think you noticed is that the judge instructed you about the

2  caution that you have to take with cooperating defendants. And,

3  listen, we didn't hide the fact that these folks pled guilty

4  and that they're hoping for leniency on their sentence. The

5  truth is almost no cooperating defendant comes in to federal

6  court and testifies against their friends because they want a

7  better America.

8           COURTROOM DEPUTY: Five minutes.

9           MR. DIMLER: They don't do it because they want to

10 improve their community. They do it because they're scared, and

11 they do it because they're in trouble. And it's the job of

12 federal agents who have researched and investigated this case

13 to corroborate that information to determine whether that

14 information is verifiable or not. So as you judge the

15 credibility of these people, no doubt you have to ask yourself

16 whether they have a motive to lie. But the other thing you

17 should ask yourself is this: Who knows better about what these

18 gentleman were up to than those four people? Who knows more,

19 and who knows better?

20     All right. The testimony or Isiah Thomas. This is crucial.

21 Thomas was an insider. You know this. Thomas told you that

22 Leanthony Gillins and Errick Daniel were Mr. Williamson's

23 right-hand men. They lived in his apartment at his house. They

24 operated out of 1808 Arlington, and Isiah Thomas was probably

25 third or fourth down the rung. And you know this because in Mr.

1  Williamson's jail telephone he said, From Ike on down, we're
2  all in trouble. From Ike on down. And he referred to himself as
3  the backbone.
4       All right. Continuing criminal enterprise, I don't have a
5  lot of time to talk about this, but what you have to do as far
6  as the CCE charges, if you 942(c) Mr. Williamson guilty of any
7  of the substantively listed offenses there, he has to have been
8  convicted of at least three of them or you cannot consider the
9  CCE charge. The violations are part of the continuing series of
10  violations. I think it's pretty self-evident that that's what
11  happened based on the evidence.
12       Mr. Williamson participated in a series of violations with
13  five other people. Well, how do we know that? You just have to
14  look at this chart. This is based on the testimony of Isiah
15  Thomas. There's way more evidence than that. You know that one
16  of his couriers met with him in the video from the 11th at his
17  house because you can read that transcript. But you also know
18  that Tuff and Shezzy got arrested, and that's confirmed. You
19  also know that he was working with Mr. Gillins, Mr. Daniel, Mr.
20  Thomas, and Mr. Gregory.
21       Let's see here.  Principal administrator, leader, again,
22  that's a similar analysis. There's definitions for that that
23  you'll see in the instructions and that the weight of the
24  methamphetamine involved in the crime was at least 1500 grams.
25  Well, just based on the testimony alone of Mr. Thomas you're

1  there, and he saw it one time. I think he said six bricks,
2  which he said were either kilos or pounds. It doesn't matter
3  either way. If it was pounds, that's 2.2 kilos per pound. If
4  not, either way it's still well over that amount. And imagine
5  this, one time, one date and time, we executed a search warrant
6  on Mr. Williamson and at just that snapshot recovered over
7  500 grams of methamphetamine.
8       Remember it doesn't matter whether the people named are in
9  the superseding indictment or whether the same five or more
10  people participated in each crime. I want to say very quickly
11  about Hendarius Archie. Remember, there were calls -- Mr.
12  Archie, it's not just the time that he was arrested with the
13  guns and money. There was this call where he talked about a cup
14  of ice and explained in a later call that it was 250 for the
15  whole and 150 for the half. He's talking about an ounce of
16  methamphetamine.
17      Mr. Taylor, he had the buys. In addition to that, he
18  talked with Johnson and then Klonde Hatter and then also Mr.
19  Archie. He talked about ice, methamphetamine, weed. Go through
20  those transcripts. Take a look at those calls. You were given
21  the code at the beginning of this case so that you could read
22  those calls and know what's being talked about.
23      And Mr. Gregory, at the buy, you may recall where the
24  cooperating witness went in there. In that call, they talked
25  about -- he offered to sell them cream. So even though the buy

1  was for cocaine, he offered to sell him cream, which you now

2  know to be methamphetamine.

3      All right. I'm losing my breath. That's a lot folks. My

4  job is to kind of take you through the elements and sort of

5  help you with that. You're going to hear from Mr. Cross a

6  little bit later after the defense attorneys give their closing

7  argument. We're confident that when you sit down and when you

8  review the evidence that we gave you and apply the facts to the

9  law in this case that you'll return verdicts of guilty on all

10  defendants.

11          THE COURT: Mr. Woodfin.

12          MR. WOODFIN: Yes, Your Honor. I was going to ask,

13  could I move the table, so I could put my notepad.

14          THE COURT: Sure. Don't --

15          MR. WOODFIN: I was going to move it back just so that

16  way she can hear me.

17      Members of the jury, good afternoon. Been here for five

18  days now. Starting on Monday in my opening statement one of the

19  first things I said to you was that the government would not be

20  able to prove beyond a reasonable doubt that Rolando Williamson

21  was the principal administrator of a drug organization, and

22  they have failed in that regard. The definition of proof beyond

23  a reasonable doubt is evidence that you would rely on without

24  hesitation in the most important of your own affairs. Think

25  about that for a moment. The most important of your own

1 affairs. We know the types of things those are, whether to move
2 for a job, where to send your kids to school, whether to take a
3 mortgage out on a house. That's the level of proof beyond a
4 reasonable doubt, and you have to stop and think like a juror
5 and think, did they really show that he was the principal
6 administrator of a drug organization?

7      So now that you know the lens, let's put the evidence
8 under the microscope. So three elements that were touched on at
9 the end of the government's first closing argument there we're
10 all apart of continuing criminal enterprise. It's a complicated
11 statute. There's several elements. I encourage you to go back
12 through the instruction and check those to carefully look at
13 them. But the three I want to focus on right now are: First,
14 that he was, in fact, a principal administrator, which they
15 have to prove beyond a reasonable doubt; two, that he directed,
16 managed, supervised five or more persons; and three, that there
17 were 1500 grams of methamphetamine.

18      So I'll start with the last one. As Mr. Dimler just said,
19 the government has offered into evidence 500 grams of
20 methamphetamine. But what he also said there, too, was if you
21 go back to Isiah Thomas's testimony, then you'll have more than
22 1500. And that's a key point because seeing is believing. They
23 moved 500 grams into evidence. There was also two other amounts
24 from controlled buys from Mr. Taylor and one of the other
25 co-defendants, but that doesn't get to 1500. And the testimony

1  from law enforcement, from Agent Gerhardt and Mr. Washington,

2  is that Mr. Williamson was not on those videos and didn't have

3  any connection to those buys. So you have to go to Isiah

4  Thomas's testimony, and I'm going to touch on that more later.

5       But when you think about Isiah Thomas, you have to think

6  about everything he has going on in his life currently and how

7  he wants to save himself. That's what he said today, that he

8  wanted to save himself. So to get to that 1500, his testimony

9  has to be apart of it. And then you have to ask yourself, would

10 I rely on Isiah Thomas's testimony in the most important of my

11 own affairs knowing what he's looking at. Not just this case,

12 because he had another case where he was caught with two kilos.

13 He was on house arrest somewhere in there. He was arrested for

14 drug trafficking. And he told you today he's here to save

15 himself. And that's a key element for continuing criminal

16 enterprise.

17      And I would never get up here and ask you to stick your

18 head in the sand. We all saw the evidence that the government

19 offered. But to think like a juror, you do have to stop and

20 carefully look at that because Isiah Thomas's testimony has to

21 be apart of that calculus. It has to.

22      Then, we have the five of more persons. And as I go

23 through these two, I will touch on some of the other counts,

24 the 924 and the 843, but my main focus will remain on Count 1.

25 But we heard testimony from Agent Gerhardt earlier in the week

1   and from Special Task Force Officer Jude Washington. And like
2   I've already covered, there was testimony about phone calls,
3   transcripts, and controlled buys. There was also testimony
4   about June 11th, 2019. And that was mentioned in the
5   government's closing argument that there was a cooperating
6   witness that day, and Agent Gerhardt testified that the
7   intention that day was this $10,000 buy. But that's not what
8   took place. In the end, he was called a courier during their
9   argument, but in the end, he came out with less than a gram.
10       And he ultimately did not -- he was taken out of the jail.
11  He was arrested after that. He's been described as a courier in
12  argument, but look back at the evidence. What actual tangible
13  evidence did he bring for the government for this trial? It was
14  less than a gram.
15       Then, we had the pole camera footage. There was some from
16  June 11th. There was some from July. The pole camera footage
17  was more telling for what wasn't presented to you and what
18  wasn't on it. Isiah Thomas wasn't on the pole camera footage.
19  Adrien Taylor, Ishmywel Gregory, Hendarius Archie, not on the
20  pole camera footage. Not there. Seeing is believing. They have
21  to prove a conspiracy. The testimony was that my client and
22  Adrien Taylor don't like each other and don't deal with each
23  other, no transactions. That's not conspiracy. There's also --
24  they have to prove that my client directed, managed, supervised
25  five or more persons. He didn't have any dealings with Mr.

V-954

1  Taylor. That's not directly managing or supervising five or
2  more people.

3      And quickly, as to the 924 counts, one count deals with
4  the rifles that were found at The Oaks apartment. Agent
5  Gerhardt testified that there were no confirmed fingerprints on
6  DNA on those rifles and that my client, Mr. Williamson, was not
7  there when those were recovered. The element there is in
8  furtherance. My client wasn't even there when they seized those
9  weapons. And there was no forensic evidence taken off those
10  weapons, and I know he testified that, in his experience and in
11  his career, they have never gotten a fingerprint off a gun. But
12  in the end, this is the side of the room with the burden of
13  proof. An explanation for a lack of evidence still means there
14  was a lack of evidence.

15      Now, there was also testimony about my client being
16  arrested at the Publix parking lot and that there was a gun in
17  his pocket and then a gun in the car. And the allegation is
18  that was during and in relation to a drug trafficking crime.
19  But the evidence was that my client was walking out of Publix
20  with balloons on the way back to his car. And while he was
21  there at that location, there was a small amount of marijuana
22  in the console of the car. So small that when I was questioning
23  Task Force Officer Washington about it, he couldn't recall it
24  had even been there. He said if it was there, it was a small
25  amount. During and in relation to a drug trafficking crime,

1 small amount of marijuana, personal use amount that one of the

2 officers didn't even remember being apart of the investigation.

3      As to the 843 count, there's still five remaining

4 allegations against my client. Pay particularly close attention

5 to Count 35, which is an alleged conversation between my client

6 and Leanthony Gillins. It's very short. Takes up about half a

7 page of a transcript. There's been all of this testimony about

8 all of this different jargon that gets used in the drug world,

9 cream, ice, the list goes on. None of that is anywhere in that

10 conversation. They use the word "it" appears, but nothing else.

11      And then after those calls, ask yourselves, what didn't

12 happen after those phone calls? It wasn't the seizure of drugs

13 or evidence or further evidence that some drug transaction

14 actually happened that day. But getting back to Count 1 and the

15 four different cooperating defendants that testified, and there

16 was -- even before they testified, there's been

17 cross-examination testimony about confidential source versus

18 confidential informant versus cooperating witness versus

19 cooperating defendant.

20      In the end, no matter how the government categorizes these

21 different witnesses, they are all looking to do something for

22 themselves. They are all looking for leniency. And that is a

23 reason to doubt the evidence that those that didn't testify in

24 court brought to them, and it's certainly a reason to doubt the

25 testimony from that stand from every one of those gentlemen

1   that were trying to save themselves. You can give each category
2   a formal name, but in the end, the altruistic witness wasn't
3   apart of this trial. They're looking for leniency, and that
4   goes back to that most important of my own affairs standard. It
5   has to be measured against that.

6       So, start with Ike Thomas. He testified again briefly
7   today and testified yesterday. Mr. Thomas claimed to have known
8   my client for many years and that they were friends, and he
9   said he saw some things, but most of his testimony was based on
10  him claiming that my client had told him all of these things.
11  Admitted, I don't have videos of what I'm saying. I don't have
12  pictures. I don't have recordings. I have my word. And you
13  heard him today say I'm trying to save myself. And that becomes
14  very, very important for Count 1.

15      And I know that they admitted a lot of evidence. I'm
16  not asking you to turn off your common sense. I'm not asking
17  you to stick your head in the sand. But I am asking you to do a
18  simple thing, and it is a difficult thing. It's to follow the
19  law and to think like a juror because you have to carefully ask
20  yourself, they have to show me that he directed five or more
21  persons.

22      And by their argument and the evidence they showed you,
23  they're asking you to rely on Isiah Thomas to be that person to
24  connect all those dots. Isiah Thomas who is looking at several
25  sentences and wants to help himself. He's their witness for the

1   five or more persons. The witness you have to trust in the most
2   important of your own affairs. That is the only way the
3   government's case gets there. And all he brought you was his
4   word.
5         Mr. Johnson didn't say anything much about my client.
6   I'm not sure he said anything at all, honestly. So we can
7   bypass him. Now, Demarcus Dewitt said he didn't know Mr.
8   Williamson like that. He also said he had never done any drug
9   transactions with Mr. Williamson, another key piece of
10  evidence. And, when Mr. -- I believe it was during Mr. Albea's
11  questioning, he said he didn't have any knowledge that Rolando
12  Williamson directed Ishmywel Gregory, another man sitting right
13  here. But their witness said, Well, no, I don't know anything
14  about that. I don't even really know Rolando Williamson.
15        Then, we get to Patrick McSwain who literally got the
16  deal of a lifetime. He's looking at a life sentence, got
17  15 years. And he was also the one that, when he was asked if he
18  was still out would he still be money laundering, and he said,
19  by my memory, No doubt. You get to judge the credibility of the
20  witness. That's obviously a reason to doubt his testimony. And
21  he talked about two different occasions where he was doing
22  something with Mr. Gregory and that my client was supposedly
23  involved with it. But then, on one occasion, he didn't even see
24  my client.
25        When you're considering all of that testimony, and I

1  know I'm belaboring the point, but Count 1 is a very serious

2  accusation, and when you come back to Isiah Thomas, you have to

3  take him at his word, and his word comes with a lot of baggage

4  because he is looking at a lot of time for this.

5        As you go back to deliberate, I do ask that you

6  carefully look at the evidence, but on behalf of my client, I

7  ask you to pay particularly close attention to those three

8  elements I talked about first. And I do not take what I'm

9  asking you lightly. I know what I'm asking you to do is

10  difficult. But if you stop and you think like a juror, and you

11  put that part of their case under the microscope because that

12  part of the case necessarily has to rely on the word of

13  somebody that told you they were just here to save themselves.

14  If you do that, we ask that you 942(c) Mr. Williamson guilty on

15  all counts, but especially pay close attention to Count 1 and

16  942(c) him not guilty.

17        THE COURT: Mr. Gardner.

18        MR. GARDNER: Thank you, Your Honor. Good afternoon

19  ladies and gentlemen. First of all, I'd like to thank you for

20  your time and attention and your service in fulfilling this

21  most solemn duty of citizenship, serving as a juror. I told you

22  on Monday that I have been summonsed in Huntsville more times

23  than you have. I never get to sit where you sit because lawyers

24  don't like other lawyers on their juries.

25        And I regret that because I think having -- if I had ever

 1  had that experience, first of all, it would make me a better
 2  lawyer, but most importantly, I think it would make me a better
 3  human being to have had your -- the experience you have now.
 4  And we're at the end of a long week. When we started on Monday,
 5  we thought and told you it might be a long two weeks. But it's
 6  not going to be. We have tried to be good stewards of your time
 7  and know how important your time is, especially as we head into
 8  this solemn religious holiday weekend.
 9       Ladies and gentlemen, it's been said often in here that
10  you must look at each of the four defendants on trial
11  individually and decide what has been proved and/or not proved
12  as to each particular defendant. I ask you to do that. You've
13  been instructed to do so. I know you will. There's something
14  else you know now, ladies and gentlemen, that you did not know
15  when we began the trial case. I represent Adrien Taylor. You
16  know that. But you didn't know that prior to coming in here Mr.
17  Taylor had previously been convicted of two serious drug
18  felonies. Now, you know. You should know because it's an
19  element of one of the charges against him.
20       A serious drug felony, ladies and gentlemen, is defined as
21  a drug crime where the maximum -- where the punishment
22  exceeds -- potential punishment exceeds ten years. That doesn't
23  mean that Mr. Taylor got ten years or 20 years, but the two
24  convictions he had, the potential exceeded ten years. And the
25  judge has given instructions on how you may consider that. And

1   this is very important. I know the inclination.

2       Well, Mr. Gardner, you're telling me your client's had two

3   previous serious drug convictions, and now you're asking me to

4   942(c) that he didn't do these?

5       I get it. But if you think about it, or allow yourself to

6   get involved in the mental operation involving that or it's

7   discussed in that manner in the jury room, ladies and

8   gentlemen, you will be violating your rights as a juror in this

9   case. I don't think you will, but I understand human nature as

10  well, okay? It's a -- you cannot use those to come to the

11  conclusion that he must have done the acts that he's charged

12  with in this case.

13      Ladies and gentlemen, Count 2, as you now know, charges

14  all these defendants with a conspiracy. The first thing you

15  must do, ladies and gentlemen, when you go back to the jury

16  room is decide whether or not, as the judge has instructed you

17  on the law of conspiracy, whether or not such a conspiracy ever

18  was, in fact, formed. But if your answer to that is yes, that

19  there was a conspiracy, you now have another duty. And that is

20  to tell us by your verdict how much of a particular substance a

21  particular defendant is responsible for.

22      Now, in Count 2, all defendants are charged, including Mr.

23  Taylor, with having conspired to distribute, first, in excess

24  of one kilogram of heroin. A kilogram, I don't mean to insult

25  your intelligence, is 1,000 grams. The only evidence you've

1  heard about Mr. Taylor's relationship to any kind of heroin

2  came from cooperating witness Kenny Johnson.

3      Now, you saw that young man testify. And we know that he

4  mumbles. I can't help but think that the amount of Xanax, you

5  will recall, seven or eight Xanax pills per day, don't tell me

6  that that won't effect a person's ability to remember things as

7  they happened, but recalling things for you now. But I do know

8  that the most he ever said and the government even said that

9  Kenny Johnson is a street-level dealer doing business in grams,

10 a gram at a time, not a kilogram at a time, not an ounce at a

11 time, one fix per customer a couple of times a day. That

12 doesn't get you anywhere near to a kilogram that you can

13 ascribe. Assuming you believe that he got it from Mr. Taylor,

14 that doesn't get you there.

15     You will also note in Count 2 that the -- there's an

16 allegation of -- that these defendants conspired to distribute

17 in excess of 5 kilograms of cocaine hydrochloride. The most

18 evidence with respect to cocaine that came in with respect to

19 Mr. Taylor was a taped conversation about an 8 ball, which as

20 we know now, is a little over -- or an eighth of an ounce,

21 three grams. And that does not equal 5,000 grams under

22 anybody's definition.

23     Now, I want to talk briefly about these undercover

24 purchases that were allegedly made by a cooperating witness

25 from Mr. Taylor. They are charged in Counts 11 and 12. And you

1  will recall that there was a cooperating witness who wore a

2  wire. One of the transactions was all on audio, and then one,

3  you will recall, was on videotape. Now, I know that the

4  government brought up here six chemists from Miami and a

5  fingerprint examiner from Quantico, Virginia.

6          MR. DIMLER: Your Honor, may we approach?

7          THE COURT: Yes.

8          (Bench conference on the record, as follows:)

9          MR. DIMLER: I'm concerned Mr. Gardner is about to

10 comment on the failure of the government to call a witness, but

11 you all know that we e-mailed you and told you that we found

12 this guy at the last minute, and I asked if anybody had any

13 objections, and y'all didn't. So I'm concerned about that.

14         MR. GARDNER: Can I comment he's not here?

15         MR. DIMLER: If you wanted him here, I could have got

16 him here.

17         MR. GARDNER: Oh.

18         MR. DIMLER: And you know that.

19         MR. GARDNER: Okay. I'll move away from that aspect to

20 something else.

21         MR. DIMLER: Okay.

22         THE COURT: Thank you.

23         MR. GARDNER: I promise you.

24              (Bench conference concluded.)

25         MR. GARDNER: Ladies and gentlemen, back to the

1   videotape, the one person you don't see, at all, is Mr. Taylor.

2   Even though this transaction was on videotape, you don't see

3   his face. You see an arm go into a car and deliver the

4   substance. That's it.

5       Now, the judge has told you the great standard by which

6   you must evaluate this evidence. The jury instruction goes that

7   proof beyond a reasonable doubt, ladies and gentlemen, is that

8   degree of proof that you would be willing to rely on in the

9   most important affairs to you personally, without hesitation.

10      I never thought I'd get to be the senior citizen of the

11  defense team because it seems like I just started practicing

12  law a couple of years ago, and, in fact, it was 1979. And I've

13  heard that instruction being given in every case I ever tried

14  and never really, really got hands around it and my head around

15  it. Proof beyond a reasonable doubt is that degree of proof

16  that you would be willing to rely on without hesitation in the

17  most important affairs to you personally.

18      Now, I got to thinking about that over the years, and

19  thought about, well, you know, certainly selecting your

20  lifetime mate would be one of those type of decisions. Then,

21  ladies and gentlemen, you're looking at a divorced guy. So

22  maybe it wasn't that. And as I stroll through the checkout line

23  at Publix, it doesn't seem to matter a whole lot to the

24  Kardashian sisters either.

25      Then, I thought, well, maybe the first time I bought a

1   house, maybe that's it. That's an important decision in my
2   life. But I came to 942(c) out that I have a bunch of friends
3   who buy and sell houses and flip them. In fact, there's even a
4   cable TV show that does that called house flipping or
5   something. So while purchasing your home may have been one of
6   those decisions, to other people a house just a thing.
7         But it all became very, very clear to me in 1997, and I'd
8   like to share that with you. I am one of five children. My
9   father was a physicist at the Johns Hopkins University Applied
10  Physics Laboratory in Boston. And he became -- he was a
11  brilliant man. Unfortunately, none of his five kids could do
12  long division, and I became the only lawyer in the family. And
13  when you're the only lawyer in the family, the rest of your
14  family asks you to do lawyer stuff for them. And among those
15  things is writing wills or being an executor of an estate or
16  making other important decisions.
17        But in 1994 through 1997, my father became desperately
18  ill. He had Alzheimer's. Don't know whether any of you have
19  ever had that experience. It's dreadful. And I watched this
20  brilliant man fade away. Until finally, one day my mother had
21  to put him somewhere. And then finally, one day, it was that
22  time, near the end. And my mother called me and said, Son, I
23  married your father 53 years ago for better, for worse,
24  sickness and in health. I can't make this decision.
25        So I flew up there. I met with my dad's two attending

1   physicians. They told me there's no way your father can live on
2   his own, and I ordered the procedure halted, and a half hour
3   later my father was dead.
4       It was then that I found what the jury instruction you've
5   just been given really means. I hope you never have to make a
6   decision like that yourself. And I want to assure you, my
7   friends, that regardless of your verdict here, nobody is dying.
8   I don't mean to suggest that. I simply mean that that's the
9   level of decision. That's what proof that you would be willing
10  to rely on without hesitation in the most important affairs to
11  you personally really is.
12      I ask you to look at all these defendants through that
13  lens, especially mine. And in a real sense, I like to think of
14  you as the life support system that separates unlimited
15  government from the freedom of the individual. And I've always
16  thought since then that a jury is the life support system for a
17  citizen accused. And before you pull the plug, make sure you're
18  convinced to that degree. Thank you.
19          THE COURT: Mr. Albea.
20          MR. ALBEA: Thank you, Judge. May I have a moment to
21  prep the courtroom?
22          THE COURT: You may.
23          MR. ALBEA: Thank you.
24              (Brief pause.)
25          MR. ALBEA: Thank you, gentlemen. I appreciate it.

1                        (Brief pause.)

2           MR. ALBEA: Thank you, Your Honor.

3           THE COURT: You may begin.

4           MR. ALBEA: Ladies and gentlemen of the jury, good

5    afternoon. It's been a long week. And I know y'all are like me,

6    and you're tired, but I ask you to bear with me. The first

7    thing I want to note is that you've heard from the government

8    in their closing and from two other counsel. You'll hear from

9    the last one, and then the government will go again. Now,

10   that's not because what they have to say is twice as important

11   as me, it just means that they have the burden, so they get to

12   go twice. And a lot of what I want to talk about has already

13   been said, so I won't repeat it. But if y'all could bear with

14   me, I'd appreciate it.

15         Y'all are required to consider each of these defendants

16   individually. As you know, I'm here with Mr. Gregory. And he's

17   charged in Count 13 with distribution of controlled substance

18   and Count 2 with conspiracy. I told you in opening that I felt

19   like after hearing the evidence you would be lead to convict

20   him of distribution of a controlled substance. Probably, you

21   are. But I want to focus on the conspiracy count.

22         On this table over here, there's a lot of drugs and a lot

23   of guns, but in my hand is Exhibit 16. That is 14.22 grams of

24   cocaine hydrochloride that a cooperating individual purchased

25   from Mr. Gregory. That is the evidence that they have on Mr.

1  Gregory. That's it. On that little table. You heard officers
2  testify that they couldn't connect Mr. Gregory to any of this.
3  That's what they had.
4      I encourage you to look at Government's Exhibit 52 and
5  compare the chemical analysis report and see that it is
6  14.22 grams. That's it, and that's all. You heard Mr. Woodfin
7  and you heard Mr. Gardner tell you that reasonable doubt is
8  proof so convincing that you would be willing to rely on it and
9  act without hesitation in the most important of your affairs.
10     So let's talk about Demarcus Whitt. He was the first of
11 the league of convicted felons to come in and grovel for mercy,
12 okay? I encourage you to go back and read the transcript of the
13 call he talked about. It's Exhibit 199 and 200 of the
14 Government's Exhibits, and it's about meeting up.
15     Now, you heard testimony from Retired Special Agent
16 Gerhardt about coded language for drugs. Read that transcript.
17 They don't talk about zips or smoke or cream or clear or blow
18 or sugar or salt or stacks or bands or whatever else it is that
19 they use coded language for. They talk about meeting up. That's
20 all they talk about. There's nothing in that transcript that is
21 inherently criminal whatsoever. All you've got is the word of
22 Demarcus Whitt who's trying not to get a life sentence to tell
23 you that, Oh, yeah, that was about the money, that was about
24 drugs.
25     We have all of these calls and transcripts in this case.

1  Well, you know they're talking about drugs. Not these calls.
2  You don't know that. You just know that because he says it
3  because, you know, he doesn't want to get a life sentence. So
4  that's what he says. All we have is his word. And where is the
5  phone call or the text message before that? Hey, I've got this
6  money I've got to give you. Where is that? How did they even
7  know that they were going to meet up. All we have is just one
8  call where they're both on the way to somewhere, and then they
9  call and say, Oh, let's go to Rodney Scott's. Oh, I'm by
10  Popeye's.
11      Where's the before and the after? What were they doing?
12  All we have is what Mr. Whitt said. Then, we moved to Patrick
13  McSwain. He, of course, was second in the league of convicted
14  felons to come in here and grovel for leniency. He brings
15  literally nothing to the table. He doesn't even have an
16  innocuous phone call where he can say oh this is the terrible
17  stuff we were talking about there. He doesn't bring you that.
18  He just comes in telling wild stories about he sold to Mr.
19  Gregory or Mr. Gregory sold to him, and I'm not sure what we
20  year we met or who all introduced us, but I'm pretty sure this
21  all happened.
22      You can't rely on that. It was interesting to me, in Mr.
23  McSwain's testimony, when I asked him to ballpark how many drug
24  transactions he had done in his lifetime. The man said he was
25  52 years old, he had been dealing drugs since he was 12, I

1  think, and he ballparked it at 100. And I was going back and
2  forth with him about that because I don't believe that number.
3  And, eventually, he said something that was very telling to me.
4  He said, Well, I just made that number up to satisfy you.
5  That's what he said. I made that number up to satisfy you.
6  Well, clearly the number was made up, right? But why was he
7  trying to satisfy me? All I wanted him to do was give me a real
8  number.

9      Then, I start to think about what else is he going to make
10  up, and who is he trying to satisfy with his plea for leniency?
11  He's going to make up a number of 100 drug transactions over
12  the course of 40 years, after swearing to tell the truth, just
13  to satisfy me, and all he wants me to do is move on to the next
14  question. What's going to say to satisfy the people who could
15  give him years of his life back? I think we know what he is
16  going to say because he sat up there and said it.

17      Proof beyond a reasonable doubt is proof so convincing
18  that you'd be willing to rely and act on it without hesitation
19  in the most important of your affairs. I found what Mr. Gardner
20  said to be quite moving about that, and I don't want to
21  trivialize that, but I wouldn't take Mr. McSwain's
22  recommendation on a place to eat or a car mechanic, because I
23  think the car mechanic would rip me off, just like he's trying
24  to rip y'all off in putting Mr. Gregory in a conspiracy he's
25  not part of because you know what Mr. Gregory did. He sold that

1   cocaine, but that's all he did. That's all the evidence he's

2   got. Look at it. It's right here. Compare.

3        Sergeant Washington said in his testimony that Mr.

4   Williamson was not present or involved in the undercover buy

5   from Mr. Gregory. Sergeant Washington also told you that the 2

6   zips that the cooperating individual referenced in the

7   undercover buy never happened. Sergeant Washington said they

8   did surveillance of a house -- I believe it was Beacon Drive --

9   and he was asked who all was there, and he said everybody,

10  almost everybody. I asked him on cross, Oh, was Mr. Gregory

11  there? No, he said, Mr. Gregory was not seen on surveillance

12  there. Do you know why? Because he wasn't part of the

13  conspiracy. That's why.

14       Retired Special Agent Gerhardt said -- he said a lot of

15  things. But to my question, he said, that the 14.22 grams of

16  cocaine, sitting on that table right there, was all the

17  contraband that they have related to Mr. Gregory. Let's

18  contemplate that you haven't seen any video of Mr. Gregory with

19  anyone else in the conspiracy. There's no phone calls between

20  Mr. Gregory and Mr. Williamson. There's no guns from Mr.

21  Gregory. There's no calculator images with Mr. Gregory's name

22  on it. There's no testimony about anything that was on Mr.

23  Gregory when he was arrested.

24       They didn't even bother searching Mr. Gregory's house or

25  car. That's how much of a nothing he was. They didn't even get

1    a search warrant to search his house. They searched two places

2    for Mr. Williamson. All they have on Mr. Gregory is 14.22 grams

3    constituting the distribution of controlled substance.

4         Ladies and gentlemen of the jury, what this is, and I hope

5    you can see it, is a unique but somewhat typical case of

6    government overreach relative to Mr. Gregory. That's what this

7    is. They got him on the buy. But that wasn't enough. They want

8    him in this conspiracy. So he's charged in this conspiracy, and

9    here we are. But they have no reliable evidence that he was

10   actually in this conspiracy, but they charged him anyway. Mr.

11   Gregory is not in this conspiracy, and he is not guilty on

12   Count 2 of this indictment. I appreciate your time.

13        THE COURT: Ms. Wallace, why do I keep calling you Ms.

14   Taylor? There's an Allison Taylor that I went to law school

15   with.

16        MR. ALBEA: I messed it all up. I can put it back.

17        MS. WALLACE: That's all I want is the table.

18   Everything else is fine. Just for my cheat sheet.

19        MR. ALBEA: I hear that.

20        MS. WALLACE: Thank you. Good afternoon, ladies and

21   gentlemen. I know, at this point, you all know who we

22   represent, but I represent Mr. Archie here. And I know y'all

23   are tired. I know you're tired of sitting. It's been a long

24   week. So I'm not going to belabor the points that you've

25   already heard. The judge has instructed you on the law. You

1   will get to take the instructions back with you. You'll have
2   the indictments with you. And my co-counsel here have done a
3   fabulous job. I could not explain reasonable doubt as
4   eloquently as Mr. Gardner could. So I'm not even going to try.
5        What I want to do is try to lead you through what you've
6   heard in a very abbreviated form, but truthfully, ladies and
7   gentlemen, I don't have a lot to say to you. There was not a
8   lot of evidence against Mr. Archie. There was not a lot of
9   testimony about Mr. Archie. You heard very little about him.
10        But I do want to start with Mr. Dimler's argument earlier.
11   He said that the phone call about the cup of ice was an ounce
12   of methamphetamine. I believe, if you'll recall, when Special
13   Agent Gerhardt took the stand and told you about all the
14   jargon, I asked him. I said, What's a cup?
15        I don't know. I've never heard that term.
16        So where, now, they get that that's an ounce, I'm not
17   sure. But I want to say to you, ladies and gentlemen, that
18   never came from the witness stand that that was an ounce. He
19   said he had never heard it. He didn't know what that was.
20        Ladies and gentlemen, that phone call could be just what
21   it sounded like, a cup of ice. We have no idea based on the
22   evidence what that is. But I will say to you, that I don't
23   think you heard any evidence other than what was mentioned in
24   Mr. Dimler's closing, that that was an ounce of meth. I don't
25   think you've heard anything else where anybody from that

1 witness stand said that Mr. Archie dealt meth or cocaine or

2 heroin. I don't believe you heard any of that.

3     Demarcus Whitt took the stand. He never even mentioned Mr.

4 Archie. Patrick McSwain, same thing. He took the stand and

5 never mentioned my client. Kenneth Johnson, same thing, no

6 mention of Mr. Archie. And then, we get to Mr. Thomas. Mr.

7 Thomas told me yesterday he had never snitched on anybody. He

8 wanted to play word games with me. That's all that was a

9 game. He wanted to tell me he had never cooperated against his

10 cousin.

11     Clearly, this morning, you heard from him that his cousin

12 was in the case, and he answered the phone and put it on

13 speaker so the agents could hear it. I think that's called

14 cooperation. And he said that he wasn't here to snitch on

15 anybody. He hadn't snitched on anybody. Ladies and gentlemen,

16 we know that's not true. We know what he said was not true.

17 That's exactly what he had done. That was why he was here.

18     He said that Mr. Archie bought 3 pounds of marijuana from

19 Mr. Williamson one to two times a week for two years. Let me

20 say to you that the testimony was that three of Mr.

21 Williamson's phones were tapped. And I believe I heard that it

22 was for 52 days on some of those phones. Mr. Archie's phone was

23 tapped for 30 days. There's not one phone call between Mr.

24 Williamson and Mr. Archie.

25     Ladies and gentlemen, Mr. Thomas was not even believable.

1    If you're buying drugs or doing business of any kind with

2    anybody one to two times a week, you're going to have to call

3    them. I don't think -- I don't think that a drug dealer is like

4    a store where you just go by, and they got hours, 9:00 to 5:00,

5    and you just run by and pick up what you need.

6         I think there's going to be some phone calls. I think

7    you're going to hear some phone calls. I think you're going to

8    see them on the pole cam at some point. If he's getting it one

9    to two times a week, surely you're going to have a phone call.

10   You're going to see something.

11        And he said, Well, you know, I was there about ten times

12   when it happened. I saw it about ten times.

13        I said, Oh, really? What about the rest of the time

14   because there's a lot of times you weren't there.

15        Oh, well, Mr. Williamson told me.

16        I said, Well, what did he tell you?

17        He couldn't -- never could explain to me what Mr.

18   Williamson told him. But ladies and gentlemen, I submit to you

19   that it's not reasonable that if you're breaking the law you're

20   going to go have a discussion about every time you do it with

21   somebody else. I told you at the beginning, when we first met,

22   that I thought that what you were going to 942(c) was that the

23   government was dancing with the devil to make this case. I just

24   didn't know how much of a devil we'd see from that witness

25   stand. So ladies and gentlemen of the jury, I ask you to 942(c)

1    Mr. Archie not guilty. Thank you.

2            THE COURT: Mr. Cross, are you ready?

3            MR. CROSS: Yes, Your Honor. If it please the court,

4    members of the jury, could we go ahead and turn on the

5    monitors? I guess I'll start off by talking about the devil we

6    had been dancing with, and please, make no mistake that we did

7    not choose these devils. We did not pick these cooperators. I

8    want to tell you who picked the cooperators, who chose the

9    cooperators, people having knowledge of what they were doing.

10   Rolando Williamson, Adrien Taylor, Ishmywel Gregory, and

11   Hendarius Archie picked the cooperators. They're the ones that

12   were dealing with them, not Retired Special Agent Wayne

13   Gerhardt. You know, if you're going to write a script in hell,

14   you can't expect angels as witnesses. It's as simple as that.

15       Now, let me clarify just a few things. To begin with, the

16   defense attorneys in this case have simply been outstanding,

17   and they're good lawyers, and they're doing their job. And

18   their job so to get you to 942(c) doubt. Our job is to get you

19   to 942(c) the truth as to reasonable doubt. You've heard all of

20   us speak on it. Most importantly, you've heard the judge speak

21   about it. It's not beyond all doubt. It's a reasonable doubt.

22   Perhaps, the most important underpinning of your verdict will

23   be reason and common sense, reason and common sense. You use

24   the same standard that you would use in important affairs of

25   your life. You'll know it in your gut.

1       Now, I'm going to have to talk about pulling the plug. I

2  want to talk about the plug that each of these defendants

3  pulled when they sold drugs, when they sold heroin laced with

4  fentanyl, and the lives that were destroyed when they made that

5  decision to engage in this drug dealing. We can't just look at

6  one of them in an isolated way. No man is an island entirely

7  unto himself. Every person is a piece of the continent, apart

8  of the man.

9       Now, as much as Mr. Albea would like us to simply look at

10  this one exhibit as to his client, it's impossible to do in

11  this case because that wasn't the only drug deal that his

12  client ever engaged in here. I'm not even going to talk about

13  it yet. Why don't we listen to what his client said?

14       Mr. Gregory, April 30th, 2019, cooperating witness asked,

15  How about half a zip?

16       Depends on what you're going to get one for.

17       And Mr. Gregory, the guy in the glasses right back there

18  replies, Want some sugar?

19       Yeah.

20       Sug, Mr. Gregory said.

21       You learned that was cocaine. Later in the conversation,

22  the cooperating witness said, I would have told you to come

23  over there earlier, but my mom and her sisters were over there.

24       Mr. Gregory, you know, this man who only sold this one

25  little bit of cocaine. Mr. Gregory said to the cooperating

1   witness, What about cream?

2       Yeah, the witness said. What you let me get a zip of that

3   for? Probably, got 2 zips.

4       Mr. Gregory, About 175.

5       How much?

6       175.

7       His own words, not one of the devils. His own words. This

8   conspiracy, as Mr. Dimler's already said but I've got to hammer

9   away at this, two or more persons who agree on an unlawful

10  plan. We don't have to prove that all 18 members of this

11  conspiracy met on Monday morning and decided we're going to

12  sell drugs. Two or more persons entered an agreement on a plan

13  to engage in a unlawful act. Kenny Johnson is a great example.

14  Kenny Johnson. Mr. Gardner did a very good job of

15  cross-examining him. Kenny Johnson is sad. He really is. You

16  heard him take that witness stand, probably was zonked out on

17  Xanax. Guess who used Kenny Johnson. Adrien Taylor. And Kenny

18  Johnson was on the street corner selling to other addicts on

19  the street, pulling the plug. And who sold to Adrien Taylor?

20  Who sold to Kenny Johnson? Ike Thomas. And who sold to Ike

21  Thomas? Rolando Williamson. They are all connected.

22      And it's more than two people. It's much more than just

23  two people. Let me go ahead and hit that. Mr. Woodfin,

24  understandably told you he doesn't expect you to stick your

25  head in the sand. I think he's confident what your verdict is

1  going to be on most of the counts. The concern for him is this
2  continuing criminal enterprise. It's important, and he told you
3  that we have to prove that Mr. Williamson is the principal
4  manager, supervisor. That's not exactly correct. And there's a
5  reason he said we must prove he is the principal -- once again,
6  he's doing a great job. The instruction that you were given
7  said a principal, not the, a principal. There could be many
8  principals, many principals.

9       And what determines whether or not they're a principal or
10  not or how involved they are is whether or not they organize or
11  direct, organize or direct five or more persons. Where did they
12  all meet to get the drugs? Where did they all congregate? Where
13  was Tevion Poole in that pole camera when Mr. Williamson was
14  unloading the weed in the suitcases? 1808 Arlington Avenue.
15  That was the hub of the majority of this drug conspiracy that
16  was taking place.

17      Drugs were stored at 1808 Arlington Avenue. That's where
18  Isiah Thomas went. That's where Leanthony Gillins went. That's
19  where Errick Daniel went. They even slept there. And whose
20  house was that? Rolando Williamson. And who paid for people's
21  attorney fees? Rolando Williamson. Who bailed them out of jail?
22  Rolando Williamson. And who threw Leanthony Gillins up against
23  the wall? Rolando Williamson. And who snatched Hendarius
24  Archie's necklaces from him? Rolando Williamson. It's
25  interesting Mr. Archie's wearing one of those necklaces. Maybe,

1  maybe this devil, Ike Thomas, knew what he was talking about.

2      Mr. Archie, let's talk a little more about him. Once

3  again, I hate to overuse the term "smoke and mirror", "red

4  herring". It's an effective tactic. In other words, let's just

5  talk about Ishmywel Gregory, this one deal, when you heard him

6  on the tape talking about working other deals. That's

7  effective, and I understand that. And if I wanted you to 942(c)

8  doubt, I'd probably focus on that. If I wanted you to 942(c)

9  truth, I'd ask you to look at the whole picture.

10      And, Mr. Archie, you're not -- forget for a second what

11  Ike Thomas said. Just forget that. What did Archie say?

12  Government's Exhibit 207 from August 7th, 2019, Taylor says to

13  Archie -- Adrien Taylor, the one who used Kenny Johnson, is

14  calling Archie and says, I need a zip and a half. Not a zip and

15  a half, a half and a quarter.

16      That's Adrien Taylor calling Archie saying that.

17  Government's Exhibit 70 on July the 19th, a customer calls

18  Archie. And you heard Ms. Wallace, good attorney, saying that

19  it was just a cup of ice, just a cup of ice. That wasn't the

20  evidence that you heard that it was just a cup of ice.

21      The next call. About eight minutes later, there is another

22  call and Archie says, 250 for a whole, 150 for a half. Now,

23  never mind that Retired Special Agent Wayne Gerhardt told you

24  what that call was about. Put that out of your mind. Use your

25  common sense and reason. That's an awfully expensive cup of

1    ice. $250 for a whole, $150 for a half.

2        Government's Exhibit 69, customer calls Archie. I got

3    some -- Archie says -- Archie says, I got some good gas. Not

4    one defendant is an island entirely to themselves. They are all

5    intermingled and interrelated and involved in an unlawful plan

6    to sell drugs. That's what we must prove to you.

7        Back to Mr. Williamson and the continuing criminal

8    enterprise. And you see the testimony that was given, but I

9    just wanted to point out, we already stated who all was at his

10   house, but also you heard the testimony of him selling, not

11   only to the ones that were at his house, but also to Darius

12   Johnson. And you heard the call to Darius Johnson, wasn't buck

13   naked, but he was low. And where is he going? He was going back

14   to the hub, back to 1808 Arlington, to get more weed. You heard

15   Ike testify that he sold to Kenny Johnson and to Adrien Taylor

16   also.

17       Then, you heard about Tuff and Shezzy. Tuff and Shezzy

18   whose running heroin from Detroit. They're running heroin.

19   Williamson goes to Detroit, and they bring the heroin back to

20   Bessemer. Pull the plug on all that, it's in Bessemer. Sell it

21   to them. The heroin that was found at the apartment was

22   predominantly fentanyl, a dangerous drug. Williamson's not

23   bringing it back. Tuff and Shezzy's bringing it back. Who's

24   organizing, who's directing if they're bringing it back? Oh,

25   you can't believe our devil, Ike Thomas. You can't believe him

1  saying that. Why don't you believe Mr. Williamson's own words?
2  You heard the phone call where he is inquiring what happened to
3  Tuff in Tennessee and whether or not he was granted probation.
4  You heard that call. That didn't come from Mr. Thomas. That
5  came from Williamson's own mouth.
6       To be a convicted felon, they are obligated to tell the
7  truth. We're not looking for doubt. We're looking for the
8  truth. And if they BS or if they don't tell the truth with
9  their cases, they're looking at life sentences. Now, surely
10 they want a deal, surely they want leniency. But they're also
11 obligated to tell the truth, and a good game to play is this
12 game also. If they were wanting to lie, if they were going to
13 lie, couldn't they have done a better job? Couldn't we have
14 coaxed them into saying they were all at 1808, and we saw
15 Gregory there also? No. Remember when I was talking to Kenny
16 Johnson about Adrien Taylor having the gun? Yeah. He didn't
17 say, Oh, he always carried a gun.
18          COURTROOM DEPUTY: Two minutes.
19          MR. CROSS: No. No. Back to Kenny Johnson, you heard
20 him testify, you heard him testify, and you'll be the judge of
21 just how honest he is, and you heard Ike Thomas and Patrick
22 McSwain and Demarcus Whitt. You'll be the judge as to the truth
23 of this, and that's exactly the way it should be.
24      I said in the beginning, In the end y'all write the final
25 chapter of the story. And I come back to that. A lot of

1  evidence to look at. I believe that as you look at the

2  evidence, you'll realize you can't look at a piece of evidence

3  in an isolated way, but you must look at it all. You must look

4  at the whole picture. Read the entire book. And when you do

5  that, and when you're reminded, when you're reminded Mr.

6  Williamson's own words.

7      Defense attorneys ask how can you believe Ike Thomas? What

8  would Rolando Williamson say? They're all fucked up from Ike

9  down, from Ike down. We ask you because the evidence demands

10  guilty verdicts as to all defendants as to all counts. Thank

11  you.

12      THE COURT: Thank you. Ladies and gentlemen, at this

13  time, I'm going to allow you to adjourn back into the

14  deliberations room. We will bring you the evidence. You'll be

15  able to consider the redacted superseding indictment and the

16  indictments in the other two cases and the jury instructions.

17  And the courtroom deputy will share additional information

18  about getting things and how to contact us. All right? Thank

19  you.

20          (Jury out at 2:15 p.m.)

21      THE COURT: Can I see counsel for a minute?

22      (Bench conference on the record, as follows:)

23      THE COURT: Do you want us to excuse the alternate

24  jurors now?

25      MR. DIMLER: Yeah.

1        MR. WOODFIN: Oh, I'm good, Judge.

2        THE COURT: All right. Do we want to clear the

3   courtroom while we go through all of the evidence? Let's clear

4   the courtroom as we go through all of the evidence. Is there

5   any objection to that?

6        MS. WALLACE: No, Your Honor.

7             (Bench conference concluded.)

8        THE COURT: All right. We're done for now. We're going

9   to clear -- we're going to let the defendants go back while we

10  get all of the evidence and bring it to the jurors. And to the

11  individuals that are sitting in the gallery, you're welcome to

12  stay at the courthouse for as long as you would like.

13     I don't know how long they'll be out. There's no way of

14  gauging that. But you all can go sit in the halls and stuff,

15  okay? All right. Thank you.

16            (Recess at 2:16 p.m. to 4:07 p.m.)

17        THE COURT: Y'all want to talk about this? Why don't we

18  just stop telling them they can ask questions? I'm serious

19  because I can never answer them. So you all want me to just say

20  I can't answer this question?

21        MR. CROSS: Yes, Your Honor.

22        MR. WOODFIN: Yes, Your Honor.

23        MR. GARDNER: Yes.

24        MR. ALBEA: Yes, Your Honor. I think that's the

25  appropriate thing.

1          MR. DIMLER: And, Judge, we're fine with you just
2    telling them. I don't know if it's your practice to bring them
3    in or not.
4          THE COURT: Any objection from the defendants?
5          MR. GARDNER: No.
6          MR. WOODFIN: No, Your Honor, not from Mr. Williamson.
7          MR. GARDNER: Not from Mr. Taylor, Your Honor.
8          MR. ALBEA: I feel a little uneasy about that. We'd be
9    happy for you to tell them -- maybe just send them a note back
10   so we can enter that into evidence that that's what you told
11   them, or would the court reporter take that down? I mean, I
12   would be fine with a note that says, I can't answer these
13   questions, love, Judge.
14         THE COURT: Right. For the record, I agree with you.
15   I'm wondering, though, I mean, do we want to -- do I want to
16   tell them that questions -- do I want to say to them, like, the
17   questions that I'm able to answer are can we see this piece of
18   evidence or -- can we see this piece of evidence is really the
19   only question that I can think of that I can answer. Otherwise,
20   there's not really any answers I can provide.
21         MR. DIMLER: I have seen, Judge, in the past where
22   they've asked a question about like maybe some nuisance theory
23   of the law, and you were able to point them to a particular
24   page of the jury instructions or something.
25         THE COURT: Yeah.

**LAUREN SHIRLEY, RPR, CRR**
Federal Official Court Reporter
1729 5th Ave N
Birmingham, AL 35203
256-390-9655/lauren_shirley@alnd.uscourts.gov

```
 1              MR. DIMLER: I mean, I hate to tell them they can't.
 2              MR. ALBEA: I guess maybe I would suggest just a little
 3  something that says the court can't answer specific questions
 4  about the facts of this case, that they're the finder of fact,
 5  something to that effect.
 6              MR. DIMLER: Or like, the evidence is closed. We can't
 7  answer any additional factual questions.
 8              THE COURT: The evidence in this case is closed. The
 9  court is unable to answer questions relating to the evidence?
10              MR. GARDNER: Relating to facts.
11              THE COURT: Facts and evidence so that I don't get --
12              MR. DIMLER: I'm with Mr. Gardner. I think facts might
13  be better just in case they had a question about like if they
14  could see something.
15              MR. GARDNER: I think that makes sense.
16              MR. ALBEA: That's fine with me, Your Honor.
17              THE COURT: The note has a date -- the note has the
18  date of 4/15/22. It the reads the evidence in this case is
19  closed, period, the court cannot answer any questions about the
20  facts, period, and it bears my signature. Are there any
21  objections?
22              MR. DIMLER: Not from the government.
23              MR. WOODFIN: Not from Mr. Williamson.
24              MR. GARDNER: Not from Mr. Taylor, Your Honor.
25              MR. ALBEA: Not from Mr. Gregory.
```

1          MS. WALLACE: Not from Mr. Archie.

2          THE COURT: Thank you.

3          MR. CROSS: Your Honor, is this entered into the

4    record?

5          THE COURT: It will be.

6          MR. CROSS: Do you think maybe we ought to redact it

7    since it looks like it's the foreperson's signature?

8          COURTROOM DEPUTY: I do.

9          MR. CROSS: Oh, okay.

10         COURTROOM DEPUTY: I will, yes.

11         MR. CROSS: Oh, you're way ahead of me.

12         THE COURT: I think that there needs to be a committee

13   in the criminal bar to set up the instruction on the questions

14   that the jury can ask. I think it was the last or second to

15   last trial I had where the jury just -- a hung jury.

16         I had done the Allen charge and everything. They just got

17   mad at me, visibly angry, because I wouldn't answer the

18   question. They asked one question, and it was something about

19   evidence. And then, they asked me a question about the law that

20   the instruction did not answer, and so I just said, All I can

21   say to you is look at the instructions. They were so ticked

22   off. They refused to move.

23         We're trying the case again in April -- I mean, August. I

24   think y'all need to figure out what we can answer and what we

25   can't answer, so we can give a more fulsome instruction so they

1  have appropriate expectations when they go back.

2                (Recess at 4:16 p.m. to 4:38 p.m.)

3          (Court in recess for they day at 4:38 p.m.)

4

5                C E R T I F I C A T E

6          I certify that the foregoing is a correct

7  transcript  from the record of proceedings in the

8  above-entitled matter.

9                        Dated: September 19, 2022

10

11

12

13

14

Lauren Shirley, RPR, CRR

15  FEDERAL OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25